RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0390p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ABDULMUNAEM ABDULLAH AL-GHORBANI
and SALAH ABDULLAH ALGHURBANI,
                                        *Petitioners,*

                                                                No. 08-3376

        *v.*

ERIC H. HOLDER, JR., Attorney General,
                                        *Respondent.*

On Petition for Review from the
Board of Immigration Appeals.
Nos. A96 417 301; A96 417 292.

Submitted: October 15, 2009

Decided and Filed: November 9, 2009

Before: GILMAN and GRIFFIN, Circuit Judges; STEEH, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Richard A. Kulics, REZA ATHARI & ASSOCIATES, Murray, Utah, for
Petitioners. David V. Bernal, Lance L. Jolley, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Respondent.

_____

## OPINION

_____

        RONALD LEE GILMAN, Circuit Judge. Abdulmunaem Abdullah Al-Ghorbani
(Abdulmunaem) and his brother, Salah Abdullah Motahar Alghurbani (Salah), arrived
in the United States in 1999 with non-immigrant visas. They had fled their native
country of Yemen after being threatened with death by Abdulmunaem's father-in-law,

_____

        [*]The Honorable George Caram Steeh, United States District Judge for the Eastern District of
Michigan, sitting by designation.

General Abu Taleb, a high-ranking military officer. The Immigration and Naturalization Service (INS) initiated removal proceedings against the brothers in 2003. At a hearing before an Immigration Judge (IJ), the brothers petitioned for a grant of asylum, the withholding of removal, and protection under the Convention Against Torture (CAT). Abdulmunaem and Salah claimed that they risked being killed by the General and his military guards if they are returned to Yemen.

The IJ denied their applications, and the Board of Immigration Appeals (BIA) affirmed the IJ's decision. For the reasons set forth below, we **DENY** review of the portion of the petition requesting asylum, but **GRANT** review of the portion of the petition requesting the withholding of removal.

## I. BACKGROUND

### A.     Factual background

Brothers Abdulmunaem and Salah were born and raised in Yemen. In 1994, they enrolled in a university in the capital city of Sana'a. (Abdulmunaem's and Salah's last names are spelled differently—Al-Ghorbani versus Alghurbani—apparently due to a translation discrepancy on the part of the American immigration authorities.) While at the university, Abdulmunaem met Hussein Mohammed Mohammed Abu Taleb (Hussein). The two became close friends. Hussein is a member of the Hashmid clan, one of "the highest kind of families in Yemen." His father is a high-ranking general in the Yemeni army who has served as an advisor to the president of Yemen. In contrast, Abdulmunaem belongs to a clan associated with the meat-cutting industry, which is considered "the lowest class in Yemen."

One fateful day at the end of 1996, Hussein asked Abdulmunaem to pick up Hussein's sister, Najla, from the university, where she had begun attending classes. Abdulmunaem agreed. Upon their first meeting, Abdulmunaem and Najla instantly connected. As Abdulmunaem explained, "we stood there for a while, I mean, me and her. We talk. It was the beginning." He continued: "After I meet her for a while, you know, we start talking, I loved her—for real I loved her and she loved me, too. She was

the best I ever meet [sic] in my life." The two began seeing each other at the university in secret.

Abdulmunaem eventually told Hussein about Abdulmunaem's love for Najla, and Hussein "was open-minded about it." Hussein warned Abdulmunaem, however, about Hussein's father, General Abu Taleb. The General took his membership in the Hashmid class very seriously and would not accept the courtship of his daughter by someone from the meat-cutting class. Abdulmunaem was nevertheless hopeful because he attended the same university where the General had sent Hussein and Najla.

Toward the end of 1997, Abdulmunaem decided that he was going to approach General Abu Taleb to seek permission to marry Najla. Some of Abdulmunaem's family members were scared about how the General would react and refused to support Abdulmunaem's decision. Two of Abdulmunaem's brothers, Salah and Mutaher, nevertheless agreed to go with Abdulmunaem to the General's home in Sana'a. Although Abdulmunaem was prepared for rejection, he expected that at worst the General would be diplomatic and say that Najla was not ready to get married at that time.

At first, the General was receptive to the proposal because he was confused about the particular family branch to which the brothers belonged. He thought that they were from "the Al-Ayani" part of the Al-Ghorbanis, which apparently is a higher-class part of the family. The brothers corrected the General and told him that they instead belonged to the "Jezarene" part, which meant the meat-cutters. Immediately upon hearing this, the General became angry, started screaming, and asked how they dared to come into his house and ask permission for Najla to marry Abdulmunaem. He launched into a speech about the superiority of his family and then kicked the brothers out of his house. Before they left, however, the General threatened Abdulmunaem and told him to stay away from Najla. In recounting this visit to the General's house, Salah stated that he had never been so humiliated.

After a few days, Hussein came to Abdulmunaem to apologize for the behavior of his father, the General. Hussein told Abdulmunaem that the General had struck Najla after Abdulmunaem left and that she had been "very sick" ever since. In addition, the

General refused to let Najla leave the house, even to go to the university. After Najla had remained sick for some time, Najla's mother was able to persuade the General to allow Najla to leave the house to go to the doctor. Najla's visit to the doctor gave Hussein an idea about how he could get Abdulmunaem and Najla together and arrange for them to get married in secret. He believed that the General would then be forced to accept the marriage when Abdulmunaem and Najla presented him with an executed marriage contract.

To effect this plan, Hussein told the General in April 1998 that Hussein was taking Najla to the doctor. Instead, Hussein took Najla to a friend's house, where Abdulmunaem met them. Hussein then acted as Najla's guardian and gave permission for her to marry Abdulmunaem, which allowed Abdulmunaem and Najla to execute a marriage contract. In this way, Abdulmunaem and Najla were married in secret, without the knowledge of the General.

All was going relatively smoothly for the couple until Najla's father decided in late 1998 to have Najla marry Abdul Rahman, her first cousin and the General's nephew. According to Hussein, there was no longer any chance that the General would accept Najla's marriage to Abdulmunaem because the General had already told his family that Najla was going to marry Abdul Rahman. Hussein then advised Abdulmunaem to "take your wife" and run away from the General. To help them, Hussein took Najla from the General's house to meet Abdulmunaem in December 1998. Abdulmunaem then traveled with Najla to his mother's house, but his mother refused to let them stay with her because of the danger posed by the General. Salah then offered his home to Abdulmunaem and Najla as a place for them to stay. The couple accepted Salah's offer and went there that night.

After leaving Najla with Abdulmunaem, Hussein returned to his father's house and presented the General with a copy of the marriage contract. The General became so enraged that he shot his own son in the chest with a gun. Fortunately, Hussein was rushed to the hospital by a relative and thus did not die as a result of the gunshot wound. The General, meanwhile, took his guards to the home of Abdulmunaem's mother. (Due

to his rank in the military, the General has soldiers with him at all times, acting as his personal guards.) When the General arrived at the house of Abdulmunaem's mother and she would not let him inside, the General and his guards tried to break down the door and started shooting at the house with their guns. Abdulmunaem's mother called the police, but when the police arrived and saw the General, they helped him break down the door.

Once inside the house, the General threatened Abdulmunaem's mother and told her that he would kill both Abdulmunaem and Najla. Abdulmunaem's mother still refused to disclose the location of her son. Someone in the neighborhood, however, sought to curry favor with the General and told him that Abdulmunaem and Najla had left with Salah. Another neighbor overheard this conversation and warned Abdulmunaem's mother that the General knew with whom the couple had departed. Abdulmunaem's mother in turn called Salah to warn him.

Upon receiving his mother's warning, Salah suggested that Abdulmunaem and Najla flee to the home of Salah's father-in-law in Aden, which is in southern Yemen about seven hours away from the capital, Sana'a. Salah's father-in-law is from India and not well known in Yemen, so Salah believed that Abdulmunaem and Najla would be safe there. Abdulmunaem and Najla agreed, and they immediately hired a car to take them from Sana'a to Aden. After arriving at the house in Aden, Abdulmunaem and Najla received a call from Salah's wife. She told them that officers of the military and the police had arrived at Salah's house, searched the residence, and had taken Salah with them.

Salah later explained what had happened after Abdulmunaem and Najla left. It was dark outside, and Salah heard multiple cars drive up to his house. He saw that at least one car had a military license plate. Immediately, Salah sent his wife and son out the back door to go stay with the neighbors. According to Salah, "I [didn't] want [them] to see—I [didn't] want . . . my son or my wife [to] see me in a bad position, because I expected every—I expected to be killed right away."

The guards of the General forced open the door to Salah's house. At first, only the General entered. He walked up to Salah and struck Salah in the face. Salah's face was covered in blood. The General's guards then started interrogating Salah about Abdulmunaem's whereabouts. Salah told the guards that he did not know where Abdulmunaem was. One of the guards, who was wearing large army boots, responded by kicking Salah in the back. After this kick, Salah could not walk. The guards then carried Salah out of the house, threw him into one of their trucks, and drove him to a local police station. Salah was detained at the police station for approximately three months.

When Salah was first taken to the police station, he was placed in a small, three-foot-by-three-foot room behind the jail that was separated from the rest of the building. Salah described the four or five days that he spent locked in this room as the worst of his life. Two of the General's guards took shifts and stayed with Salah at all times. They continually interrogated Salah, trying to force him to disclose the location of Abdulmunaem and Najla. During this time, Salah never saw any police officers, only the General's personal guards.

In an effort to induce Salah to reveal his brother's location, the guards would talk between themselves so that Salah could overhear them. They would make comments to the effect that they were supposed to kill Salah if he did not talk, that some of Salah's family members had been in "accidents," that the General's men were following Salah's brothers, and that his mother's house had been burned down. The guards would also "talk about" Salah's wife, telling Salah, "We can kill your family."

Other measures taken by the guards to weaken Salah's resolve included pulling out his chest hairs and standing on his toes with the heels of their army boots. The guards deprived Salah of sleep and would not allow him to use the bathroom. Salah was forced to either urinate and defecate on himself or in the corner of his small cell. He was not given any blankets for warmth, even though it was the middle of the winter. On the fourth or fifth day, the guards threw a dead, rotting cat covered with bees into Salah's cell and told him that they were going to burn down the home of one of his brothers. At

this point, Salah was crying and ready to collapse. He therefore decided to make up a story. Salah told the guards that Abdulmunaem and Najla had fled to Saudi Arabia. After questioning Salah further about the couple's exact location in Saudi Arabia, the General's guards finally left the jail. Before leaving, however, they warned Salah that if they did not find Abdulmunaem and Najla, Salah would be killed.

When the General's guards left, the police moved Salah into a larger room inside of the jail. But whenever an official government inspector came to the police station, Salah was moved to the back room so that he would not be discovered. After about two months, one of the police officers took pity on Salah and called another one of Salah's brothers (not identified in the record) to tell him where Salah was. The brother in turn called the "district attorney" to notify the district attorney about Salah's detention. As a result, a government inspector came to the jail, found Salah, and interviewed him. The inspector discovered that Salah was being held at the behest of General Abu Taleb without any pending charges. At that time, the General was in Saudi Arabia searching for Abdulmunaem and Najla. Because of the General's absence, the district attorney was able to order Salah's release from the jail. The inspector advised Salah, however, to leave Sana'a as soon as possible, before the General's return.

Salah heeded the inspector's advice. When Salah was released from the jail in March 1999, he left Sana'a that same day without even stopping to see his wife and son at his mother's house. He traveled straight to his father-in-law's house in Aden, where Abdulmunaem and Najla were staying. Salah remained there for one night and then stayed at various friends' homes in the area for about five or six months. He was not harmed or harassed during his time in Aden.

While Salah was being detained at the jail in Sana'a, Abdulmunaem and Najla lived in Aden with Salah's father-in-law. Abdulmunaem left Aden only once for two days in February 1999 to go to the American Embassy in Sana'a for the purpose of obtaining a visa to travel to the United States. So that Najla could also obtain a visa, Abdulmunaem sent his sister, who had previously traveled to the United States, with Najla to the American Embassy in Sana'a. Both Najla and the sister were able to secure

visas.  All three then traveled to the United States, with Abdulmunaem arriving in May 1999 and Najla and Abdulmunaem's sister arriving in September 1999.  None of them had any trouble getting through airport security when leaving Yemen.  Abdulmunaem explained that this was because the General thought that they were in Saudi Arabia and was not looking for them in Yemen at that time.

Salah learned of Abdulmunaem's plan to flee to the United States on the night that Salah stayed at his father-in-law's house in Aden.  He decided that this was a good idea for himself as well, so Salah briefly returned to Sana'a to obtain a visa to enter the United States.  During his time in Sana'a, Salah stayed away from his mother's house to avoid trouble.  He obtained a visa and traveled to the United States at the end of September 1999.  His wife and son followed him a year later.  They all were able to leave Yemen without being detected by the General.

None of Abdulmunaem and Salah's four siblings who are still in Yemen have been harmed. Nor has any harm come to their mother after they left the country.  Since arriving in the United States, Abdulmunaem has remained in contact with Hussein.  They have talked about the possibility of reconciliation with General Abu Taleb, but Hussein has told Abdulmunaem that this is not likely. According to Hussein, the General is "crazy" and would not hesitate to kill Abdulmunaem and Najla.  Even Hussein has been disowned and is no longer recognized by his father.

Sometime in 2002, Abdulmunaem met with Dr. Al-Bishari, the Yemeni Minister of Foreign Affairs, in Detroit, Michigan to try to repair Abdulmunaem's relationship with General Abu Taleb. Abdulmunaem told Dr. Al-Bishari about the situation with the General, and Dr. Al-Bishari promised to do his best to resolve the problem.  Upon returning to Yemen, Dr. Al-Bishari met with the General, but was unable to change his views.  The General said that he had no daughter because she was dead.  Similarly, Hussein learned from his mother that the General was in complete denial of Najla's marriage, claimed that she was dead, and said that if he ever saw Najla, he would "make her dead."

More recently, Abdulmunaem and Najla learned that they also have reason to fear the actions of Abdul Rahman, the General's nephew and "right hand," whom the General intended for Najla to marry. According to Hussein, Abdul Rahman constantly reminds the General about Najla's "dishonorable" marriage and urges the General to "wash the shame from the family." Abdulmunaem and Salah explained that the General would "wash his honor" by killing Najla.

Najla acknowledged that she is "doomed to execution" in Yemen due to the shame that she has brought on the General's family. The General could also elect to kill Abdulmunaem because Abdulmunaem was the one who "assault[ed]" the General's honor. This form of "honor killing" remains an acceptable practice in Yemen because, under Islamic-based law, a father cannot be prosecuted for killing his daughter or son. Moreover, even if it were a crime, the General would not be prosecuted because of his military authority. As described by Abdulmunaem, the General is "an agent [of the] Yemen government."

Salah is "in the same basket" as Abdulmunaem and Najla because he helped Abdulmunaem and Najla escape, and because he lied to the General's guards about the couple's whereabouts. Significantly, the only reason that he was released from jail was because the General was out of the country at the time. When the General returned and learned that Salah had been released, the General "went crazy," made threats, and said that he could find Najla anywhere in Yemen. The General even took his guards to Salah's former residence to look for Salah, but fortunately Salah's family no longer lived there.

News of Abdulmunaem's and Salah's applications for asylum in the United States has traveled back to Yemen, and Najla's intended husband, Abdul Rahman, has spread this news to generate ill will toward them. In Yemen, an application for asylum in another country is considered anti-government and is viewed with hostility.

Based on this danger, Abdulmunaem and Salah seek to remain in the United States. They are also concerned about the safety of their children. Since they left Yemen, Abdulmunaem and Najla have had three children, and Salah and his wife have

had another child. All of these children were born in the United States and have lived in this country for their entire lives. In addition, although Salah's first child was born in Yemen, he has lived in the United States ever since arriving with his mother in 2000.

**B.      Procedural background**

After Abdulmunaem and Salah had been in the United States for over three years, the INS commenced removal proceedings against them. This was in January 2003. The INS charged Abdulmunaem and Salah with remaining in the United States beyond the expiration of their visas without authorization. Abdulmunaem's visa expired in August 1999 and Salah's expired in October 1999. In response, Abdulmunaem and Salah conceded removability but, in February 2005, they filed applications for asylum and the withholding of removal under Sections 208(a)(1) and 241(b)(3)(A) of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1158(a)(1), 1231(b)(3)(A). They claimed that they were eligible for asylum under the INA due to their well-founded fear of persecution on account of their membership in a particular social group. Abdulmunaem and Salah also sought withholding of removal for this reason and for protection under the CAT. In the alternative, they applied for the privilege of voluntary departure from the United States.

Abdulmunaem, Najla, and Salah appeared before the IJ in February and May 2006 and testified to the facts recounted above. In support of their applications, Abdulmunaem and Salah also provided witness statements, personal documents, and various articles detailing the culture of Yemen. The IJ took these matters under advisement and issued a written decision in July 2006, which denied Abdulmunaem and Salah any form of relief.

In his order, the IJ found that neither Abdulmunaem nor Salah had filed applications for asylum within the one-year statutory period set forth in Section 208(a)(2)(B) of the INA, 8 U.S.C. § 1158(a)(2)(B), and 8 C.F.R. § 1208.4(a)(2). In addition, they had not demonstrated the existence of changed circumstances materially affecting their eligibility for asylum, which could have excused the untimeliness of their applications. The IJ was not persuaded by Abdulmunaem and

Salah's argument that the General's rejection of Dr. Al-Bishari's efforts of reconciliation constituted changed circumstances. And even if he were to accept that argument, the IJ concluded that they had failed to apply for asylum within a reasonable time after this purported change in circumstances, thus obviating the potential application of this exception.

Putting aside the procedural defects in Abdulmunaem's and Salah's applications for asylum, the IJ found that the applications should be denied on their merits. The IJ reached this conclusion despite finding that Abdulmunaem and Salah were credible, regardless of some minor discrepancies between their personal statements and their testimony. He determined, however, that Abdulmunaem's and Salah's "accounts of past persecution lack[ed] a sufficient nexus with one of the five protected categories." These five categories protected by the INA are race, religion, nationality, membership in a particular social group, and political opinion. INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A).

The IJ reasoned that "[Abdulmunaem's and Salah's] fears arise from a family grudge, not membership in a particular social group as they claim." Moreover, even if there was a sufficient nexus, the IJ concluded that neither Abdulmunaem nor Salah had suffered past persecution in Yemen. Abdulmunaem was never detained by the General, and the IJ determined that the actions taken by the General's guards against Salah were not severe enough to constitute persecution. Because the IJ decided that Abdulmunaem and Salah had not demonstrated past persecution, they were not entitled to a rebuttable presumption of future persecution.

The IJ also found that even if the brothers had shown past persecution, the conditions in Yemen had changed for the better since their departure. In comparing the 1999 State Report with the 2005 State Report, the IJ determined that "conditions in Yemen have drastically improved in the six years since [Abdulmunaem and Salah] arrived in the United States." He continued, "There have been significant improvements in human rights and there were no known political killings or disappearances." Moreover, the IJ noted that Abdulmunaem, Najla, and Salah had left Yemen through

regular airport security checks without being detained, and their family members in Yemen have remained unharmed by the General. The IJ therefore concluded that even if Abdulmunaem and Salah had demonstrated past persecution, there was evidence in the record to rebut the presumption of a well-founded fear of future persecution. Accordingly, Abdulmunaem and Salah were found to be ineligible for asylum. In light of this determination, the IJ ruled that Abdulmunaem and Salah necessarily could not make the more stringent showing required to demonstrate eligibility for either the withholding of removal or for protection under the CAT. He also decided that the brothers were ineligible for the privilege of voluntarily departing from the United States.

Abdulmunaem and Salah did not challenge the IJ's rulings regarding the CAT or voluntary departure in their appeal to the BIA or in their petition for review before this court. We therefore will not address these two issues. *See, e.g.*, *Ramani v. Ashcroft*, 378 F.3d 554, 560 (6th Cir. 2004) (interpreting the administrative-exhaustion requirement set forth in Section 242(d)(1) of the INA, 8 U.S.C. § 1252(d)(1), to mandate that "only claims properly presented to the BIA and considered on their merits can be reviewed by this court in an immigration appeal"). On the other hand, Abdulmunaem and Salah did appeal to the BIA from the IJ's denial of their applications for asylum and the withholding of removal.

The BIA affirmed the decision of the IJ. Regarding the IJ's finding that Abdulmunaem and Salah had not demonstrated a nexus between the claimed persecution and a protected statutory ground, the BIA reasoned:

> [Abdulmunaem and Salah] have failed to demonstrate that the mistreatment they suffered at the hands of General Abu Taleb or his guards, or any such mistreatment that they may suffer in the future, was (or will be) inflicted "on account of" "membership in a particular social group" consisting of their family or on account of any other protected ground. In particular, [Abdulmunaem and Salah] have not shown that General Abu Taleb was motivated to harm them *because* of their membership in the Al-Ghorbani family. The respondents testified that General Abu Taleb did not want his daughter to marry Abdulmunaem because [Abdulmunaem's] family name indicates that [Abdulmunaem and Salah] are from a "meat cutter" class, which is the lowest profession in Yemen, whereas [the General] is from the ruling, wealthy Hashemite

> tribe. However, the threats and mistreatment [Abdulmunaem and Salah] received appear to have been motivated by General Abu Taleb's anger that his daughter dishonored the family by disobeying him and marrying without his permission. Indeed, General Abu Taleb shot his own son Hussein upon learning of the marriage and now will not recognize his son. There is no indication that this is anything other than a personal vendetta that General Abu Taleb has against his son-in-law for marrying his daughter without his permission.

(Emphasis in original.)

The BIA also agreed with the determination of the IJ that Abdulmunaem and Salah had failed to show a clear probability of future persecution. According to the BIA, the record demonstrated that Abdulmunaem and Najla remained in Yemen for "some time" without harassment and were able to leave Yemen without any problems. The BIA also noted that Salah "obtained the help of the district attorney to secure his release from detention," and then remained in Yemen for six months without harm. In addition, the BIA pointed out that despite being previously threatened by the General, Abdulmunaem and Salah's mother has not been further harassed. Finally, the BIA determined that Abdulmunaem and Salah have not proven that the government of Yemen is unwilling or unable to protect them.

The appeals of Abdulmunaem and Salah were therefore dismissed by the BIA. This joint petition for review followed, in which Abdulmunaem and Salah argue that the BIA erred in finding them ineligible for either asylum or the withholding of removal.

## II. ANALYSIS

### A.     Standard of review

Our task is to ascertain whether substantial evidence supports the BIA's determination that Abdulmunaem and Salah failed to sustain their burdens of establishing eligibility for asylum and the withholding of removal. Where, as here, the BIA reviews the IJ's decision and issues a separate opinion, rather than summarily affirming the IJ's decision, we review the BIA's decision as the final agency determination. *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007). To the extent that the BIA has adopted the IJ's reasoning, however, we also review the IJ's decision.

*Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). Questions of law are reviewed de novo, but substantial deference is given to the BIA's interpretation of the INA and applicable regulations. *Morgan*, 507 F.3d at 1057. "The BIA's interpretation of the statute and regulations will be upheld unless the interpretation is arbitrary, capricious, or manifestly contrary to the statute." *Id.* (citation and internal quotation marks omitted).

When reviewing administrative findings of fact, we utilize the substantial-evidence standard. *Ben Hamida v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007). Under this standard, we must affirm the factual findings of the IJ (as affirmed by the BIA) if the findings are supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). We may not reverse such findings simply because we would have decided them differently. *Gishta v. Gonzales*, 404 F.3d 972, 978 (6th Cir. 2005). Rather, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." INA § 242(b)(4)(B), 8 U.S.C. § 1252(b)(4)(B). In addition, because the IJ in the present case found that Abdulmunaem and Salah were credible, we will accept the factual statements in the petitions and testimony as true. *See Gilaj v. Gonzales*, 408 F.3d 275, 285-86 (6th Cir. 2005).

**B.     Asylum**

   *1.     Timeliness review*

The first issue raised by Abdulmunaem and Salah is whether the IJ failed to afford them due process by not excusing the untimeliness of their applications for asylum. Generally, to be eligible for asylum, an alien must file an application within one year of arriving in the United States. INA § 208(a)(2)(B), 8 U.S.C. § 1158(a)(2)(B). But the IJ may excuse the untimeliness of a late-filed application where the alien demonstrates "either the existence of changed circumstances which materially affect the [alien's] eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the [one-year period]." INA § 208(a)(2)(D), 8 U.S.C. § 1158(a)(2)(D).

Pursuant to Section 106(a)(1)(A)(iii) of the REAL ID Act of 2005, 8 U.S.C. § 1252(a)(2)(D), judicial review of asylum applications denied for untimeliness is authorized only where the appeal seeks review of "constitutional claims or matters of statutory construction," not where the question is "discretionary" or "factual." *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006); *see also id.* at 746 n.1 (explaining that the judicial-review provision of the REAL ID Act "applies to all appeals from removal orders issued before, on, or after the date of the enactment" (citation and internal quotation marks omitted)). Because the existence of changed circumstances is an inherently factual inquiry, we lack jurisdiction to review the IJ's and the BIA's factual determinations on this issue. *See id.* at 748.

### 2.    *Due process claims*

Abdulmunaem and Salah attempt to avoid the above-described jurisdictional bar by claiming that both the IJ and the BIA committed constitutional errors when they rejected the brothers' asylum applications as untimely. Specifically, the brothers assert that the IJ did not adequately set forth his reasons for reaching his decision, thereby violating their due process rights. They also contend that the BIA erred by failing to conduct an independent review of the record.

Abdulmunaem and Salah correctly assert that aliens are entitled to the due process of law in deportation proceedings. *See Gilaj*, 408 F.3d at 290. "Due process requires that an alien be afforded a full and fair hearing." *Id.* To prevail on a due process claim, an alien must demonstrate that a constitutional error caused actual prejudice; i.e., that the error materially affected the outcome of the alien's case. *Mapouya v. Gonzales*, 487 F.3d 396, 416 (6th Cir. 2007).

In his order denying Abdulmunaem's and Salah's applications, the IJ detailed the relevant facts and applicable law concerning the timeliness requirement for an asylum application. He explained:

> The Court finds that [Abdulmunaem and Salah] have not proven any reason for missing the one year deadline. [They] fled Yemen to escape a family feud and accompanying abuse which was caused by

Abdulmunaem's marriage to the general's daughter. [Abdulmunaem's and Salah's] hope that the situation would cool down is no excuse for missing the one year filing deadline. To hold otherwise would render the one year requirement meaningless.

And even if Abdulmunaem and Salah had demonstrated a qualifying change in circumstances, the IJ concluded that they had waited too long to file their applications for asylum. The only evidence of "changed circumstances" that they had offered was the General's rejection of Dr. Al-Bishari's efforts at reconciliation. Even after this rejection, however, Abdulmunaem and Salah waited over two years to file their applications. The IJ concluded that the applications were not filed within a reasonable period of time after the purported change in circumstances. He therefore found the applications to be untimely.

In their petition for review, Abdulmunaem and Salah disagree with the IJ's statement that a finding in their favor would render the one-year requirement "meaningless," contending that this assertion was offered without reason. They also argue that the IJ did not adequately explain his conclusion that they did not file their applications within a reasonable time after 2002. Finally, Abdulmunaem and Salah assert that the BIA's opinion is "not convincing" and reflects "the same lack of rationality as that of the Immigration Judge."

We find no merit in the due process arguments of Abdulmunaem and Salah. To begin with, Abdulmunaem and Salah have not shown that either the IJ or the BIA failed to afford them the due process of law. The explanations offered by the IJ and the BIA are thorough enough to allow us to meaningfully review their decisions. As demonstrated by the portion of the IJ's order quoted above, the IJ adequately set forth the underlying facts and law, as well as the basis for his decision. Similarly, the opinion of the BIA demonstrates that the BIA independently reviewed the record. The BIA detailed the arguments of the parties and the findings of the IJ, agreed with the conclusions of the IJ, and exercised its lawful authority to "issue a brief order affirming, modifying, or remanding the decision under review." 8 C.F.R. § 1003.1(e)(5). Such treatment does not constitute a denial of due process. *See Gishta v. Gonzales*, 404 F.3d

972, 980 (6th Cir. 2005) (rejecting a similar claim and noting that 8 C.F.R. § 1003.1(e)(4) authorizes the BIA to summarily affirm without opinion); *Scorteanu v. INS*, 339 F.3d 407, 412 (6th Cir. 2003) ("What is required is merely that [the BIA] consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." (citation and internal quotation marks omitted)).

Moreover, even if Abdulmunaem and Salah had demonstrated a denial of due process, they have failed to show any resulting prejudice. Dr. Al-Bishari's failure to reconcile the General with Abdulmunaem, Salah, and Najla does not constitute a change in circumstances. This failed reconciliation instead shows that circumstances *have not* changed: Abdulmunaem, Najla, and Salah remain estranged and under the threat of death from the General. We thus find unpersuasive Abdulmunaem and Salah's argument that the changed-circumstances exception applies to excuse their untimely applications for asylum. A remand would not result in a different outcome. Abdulmunaem and Salah have therefore failed to demonstrate any prejudice resulting from the claimed constitutional errors. Accordingly, we reject Abdulmunaem and Salah's joint petition to review the denial of their applications for asylum.

## C.        Withholding of removal

The second issue raised by Abdulmunaem and Salah is whether the BIA erred in affirming the IJ's determination that they were not entitled to the withholding of removal because they failed to demonstrate persecution on account of their membership in a particular social group. To be eligible for withholding of removal pursuant to the INA, an alien must establish that "the alien's life or freedom would be threatened in [the proposed country of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). The alien must establish a "clear probability of persecution," meaning that "it is more likely than not that the alien would be subject to persecution." *INS v. Stevic*, 467 U.S. 407, 413, 424 (1984). Thus, the burden of proof for demonstrating eligibility for the withholding of removal is more stringent than the

burden for establishing eligibility for asylum, which requires only a "reasonable possibility of suffering such persecution." *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005) (quoting 8 C.F.R. § 1208.13(b)(2)(i)(B)).

The issue before us is whether substantial evidence supports the conclusion of the BIA that Abdulmunaem and Salah were ineligible for the withholding of removal. This requires the resolution of two issues. First, we must consider whether the record compels a finding that Abdulmunaem and Salah were in fact members of a particular social group for purposes of the statute. *See Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003) (setting forth the two factors for reviewing the denial of a claim for the withholding of removal). Second, we must determine whether Abdulmunaem and Salah have "presented sufficient evidence to compel a finding that [they] would, more likely than not, be persecuted on the basis of that membership." *See id.* (same).

### 1.      *Particular social group*

The BIA has defined a "particular social group" as "a group of persons all of whom share a common, immutable characteristic." *In re Acosta*, 19 I. & N. Dec. 211, 233 (B.I.A. 1985), *overruled on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (B.I.A. 1987). "[W]hatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.*; *see also Castellano-Chacon*, 341 F.3d at 546, 549 (adopting the BIA's definition of a "social group" and holding that tattooed youths fall outside of that definition).

Since *Acosta*, the BIA has stated that the two key characteristics of a particular social group are particularity and social visibility. *In re S-E-G-*, 24 I. & N. Dec. 579, 582 (B.I.A. 2008). "The essence of the 'particularity' requirement . . . is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." *Id.* at 584. Social visibility, on the other hand, requires "that the shared characteristic of the group should generally be recognizable by others in the community." *Id.* at 586. The shared characteristic "must be considered in the context of the country of concern

and the persecution feared." *Id.* at 586-87; *see also In re R-A-*, 22 I. & N. Dec. 906, 918 (B.I.A. 1999) (noting that "for the group to be viable . . . , we believe there must also be some showing of how the characteristic is understood in the alien's society, such that we, in turn, may understand that the potential persecutors in fact see persons sharing the characteristic as warranting suppression or the infliction of harm") (vacated and remanded by the Attorney General on January 19, 2001 for reconsideration "in light of the final rule" proposed at 65 Fed. Reg. 76,588 (Dec. 7, 2000), which was never finalized, and again remanded by the Attorney General on September 25, 2008 to the BIA to "proceed as it sees fit with its reconsideration . . . based on the current regulations, because the proposed rule has not been made final," 24 I. & N. Dec. 629, 630-31 (Att'y Gen. 2008)).

In the present case, Abdulmunaem and Salah have offered several characteristics of the social group to which they purportedly belong. These characteristics include "people who have flaunted traditional Islamic values by marrying despite the disapproval of traditional families," "young, westernized people [who] have defied the traditional norms of society," "the Al-Ghorbani (or Alghurbani) family," "their family, who, as members of a less valued social class, *i.e.* traditionally meatcutters . . . have defied the norms of Yemeni society by getting married despite being forbidden to," and "those who dishonored the family by disobedience or marrying without permission." (Alterations, citations, and internal quotation marks omitted.)

The IJ did not expressly decide whether Abdulmunaem and Salah belonged to a particular social group as defined by the statute, but instead determined that they had failed to demonstrate the required nexus between the alleged persecution and a protected statutory ground. In affirming the decision of the IJ, the BIA similarly assumed without deciding that Abdulmunaem and Salah belonged to a particular social group and agreed with the IJ that the evidence did not establish the requisite nexus.

Abdulmunaem and Salah's claimed social group has two facets, one familial and the other based on their opposition to a particular Yemeni social norm. The first characteristic of their proffered social group—membership in the same family—is

widely recognized by the caselaw. *Acosta*, 19 I. & N. Dec. at 233 (recognizing "kinship ties"); *see also In re H-*, 21 I. & N. Dec. 337, 342-43 (B.I.A. 1996) (recognizing as a social group the Marehan subclan of Somalia, which shares ties of kinship and linguistic commonalities). Specifically, as acknowledged by this court and by other circuits, a family is a "particular social group" if it is recognizable as a distinctive subgroup of society. *See, e.g.*, *Toma v. Gonzales*, 179 F. App'x 320, 324-25 (6th Cir. 2006) (recognizing those who possessed "immutable kinship ties to family members who were politically active in the Iraqi resistance" as a social group); *Ayele v. Holder*, 564 F.3d 862, 869-70 (7th Cir. 2009) ("Our circuit recognizes a family as a cognizable social group under the INA, as do our sister circuits." (citations omitted)); *Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir. 1993) ("There can, in fact, be no plainer example of a social group based on common, identifiable and immutable characteristics than that of the nuclear family.").

In the present case, the Al-Ghorbani family possesses several common, immutable characteristics that establish it as a particular social group. The first shared characteristic is the ties of kinship. In addition, "Al-Ghorbani" designates the particular region of Yemen in which the family historically resided. The branch of the family to which Abdulmunaem and Salah belong—the "Jezarene"—further designates them as being affiliated with the meat-cutter class, which is considered the lowest class of persons in Yemen. Thus, the Jezarene branch of the Al-Ghorbani family shares the common, immutable characteristics of kinship, regional background, and class. It therefore qualifies as a particular social group under the INA.

Abdulmunaem and Salah offer a second characteristic of their proposed social group: it is made up of young, westernized people who have defied traditional, Islamic values by marrying without paternal permission. This description, based on opposition to repressive and discriminatory cultural traditions, also finds support in the caselaw. For example, the United States Court of Appeals for the Third Circuit has commented that Iranian feminists who refuse to conform to the government's gender-specific laws and social norms constitute a particular social group. *Fatin v. INS*, 12 F.3d 1233, 1241

(3d Cir. 1993). Now-Justice Samuel Alito, writing for the court, explained that "if a woman's opposition to the Iranian laws in question is so profound that she would choose to suffer the severe consequences of noncompliance, her beliefs may well be characterized as 'so fundamental to [her] identity or conscience that [they] ought not be required to be changed.'" *Id.* (quoting *Acosta*, 19 I. & N. Dec. at 234).

Other circuits have recognized similar social groups. *See, e.g.*, *Yadegar-Sargis v. INS*, 297 F.3d 596, 603 (7th Cir. 2002) (identifying "Christian women in Iran who do not wish to adhere to the Islamic female dress code" as a particular social group); *Safaie v. INS*, 25 F.3d 636, 640 (8th Cir. 1994) (concluding that "Iranian women who advocate women's rights or who oppose Iranian customs relating to dress and behavior" could constitute a particular social group), *superseded by statute on other grounds, as recognized in Rife v. Ashcroft*, 374 F.3d 606, 614-15 (8th Cir. 2004); *see also In re Kasinga*, 21 I. & N. Dec. 357, 365 (B.I.A. 1996) (recognizing as a particular social group "young women of the Tchamba-Kunsuntu Tribe who have not had [female genital mutilation], as practiced by that tribe, and who oppose the practice"). These cases demonstrate that a particular social group may be made up of persons who actively oppose the suppression of their core, fundamental values or beliefs.

In this country, the right to marry is considered fundamental. *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (overturning the convictions of a married couple charged with violating Virginia's ban on interracial marriages and concluding that marriage is "one of the basic civil rights of man" and "fundamental to our very existence and survival" (citation and internal quotation marks omitted)). Persons who are forbidden to marry, or those who oppose discriminatory restrictions on marriage, may therefore constitute a particular social group. *See Faruk v. Ashcroft*, 378 F.3d 940, 943 (9th Cir. 2004) ("We have established that persecution for marrying between races, religions, nationalities, social group memberships, or political opinion is persecution on account of a protected ground." (alterations, citation, and internal quotation marks omitted)); *cf. Chen v. Ashcroft*, 381 F.3d 221, 231 (3d Cir. 2004) (finding no persecution where under-aged persons in China were not permanently barred from marriage).

Abdulmunaem and Salah belong to a social group that opposes the repressive and discriminatory Yemeni cultural and religious customs that prohibit mixed-class marriages and require paternal consent for marriage. The active opposition of both Abdulmunaem and Salah distinguishes them from an impermissibly broad category of "young" or "westernized" persons in Yemen. *See, e.g.*, *Rreshpja v. Gonzales*, 420 F.3d 551, 555 (6th Cir. 2005) (explaining that "generalized, sweeping classifications" of persons do not constitute a particular social group under the INA); *Sharif v. INS*, 87 F.3d 932, 936 (7th Cir. 1996) (describing the cognizability of westernized Iranian women as a particular social group "debatable at best").

Moreover, Abdulmunaem and Salah have been identified by their community as persons opposing Yemen's traditional, paternalistic, Islamic marriage traditions. The family members who refused to support Abdulmunaem's marriage to Najla, the neighbor of Abdulmunaem and Salah's mother who reported the brothers' whereabouts to the General, and the local authorities who permitted Salah to be detained for months without charges and refused to prosecute the General for shooting his own son demonstrate that opposition to Yemeni marriage traditions is a characteristic which Yemeni society generally, and the General specifically, "seeks to overcome." *See Khalili v. Holder*, 557 F.3d 429, 436 (6th Cir. 2009) (defining persecution as the infliction of harm to overcome a characteristic of the victim). Because of the fundamental nature of marriage, this is a characteristic that Abdulmunaem and Salah should not be required to change. *See Acosta*, 19 I. & N. Dec. at 233. Accordingly, the "opposition" aspect of their actions places them in an identifiable social group.

### 2. *Persecution because of social group membership*

We next consider whether Abdulmunaem and Salah would be subject to persecution in Yemen because of their membership in a particular social group, thus entitling them to the withholding of removal. "Unlike a discretionary asylum grant, withholding of removal is mandatory if the applicant can establish a clear probability of future persecution." *Mapouya v. Gonzales*, 487 F.3d 396, 413-14 (6th Cir. 2007).

Persecution is defined as "the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim." *Khalili*, 557 F.3d at 436 (citation and internal quotation marks omitted). Because a critical element of persecution is motive, a petitioner "must provide *some* evidence of it, direct or circumstantial." *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992) (emphasis in original). One cannot simply presume that persecution is on account of a statutory ground. *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008). Instead, in considering whether an alien has demonstrated the required nexus, this court has instructed:

> In addition to examining the nature of the conduct on which an application for asylum is based, we have looked to the overall context of the applicant's situation to ascertain whether the applicant has been subjected to persecution within the meaning of the INA so as to give rise to a presumption of a well-founded fear of future persecution.

*Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005).

Asylum and the withholding of removal are "not available to an alien who fears retribution *solely* over personal matters." *Zoarab*, 524 F.3d at 781 (emphasis added). But when an applicant demonstrates that he or she "was persecuted on the basis of more than one factor," the applicant is eligible for asylum or the withholding of removal "so long as one of those factors is a protected ground under the INA." *Marku v. Ashcroft*, 380 F.3d 982, 988 n.10 (6th Cir. 2004). Based on this principle, the United States Court of Appeals for the Second Circuit reversed a decision of the BIA in which the BIA found that a union leader from Guatemala was targeted by the government because of his economic beliefs rather than for political reasons. *Osorio v. INS*, 18 F.3d 1017, 1028 (2d Cir. 1994). The Second Circuit found that the issue was not so clear cut, explaining that "the conclusion that a cause of persecution is economic does not necessarily imply that there cannot exist other causes of the persecution." *Id.* In reversing the BIA, the court reasoned that "[a]ny attempt to unravel economic from political motives is untenable in this case." *Id.* at 1029.

Similarly, in the instant case, the General's personal motives cannot be unraveled from his motives based on Abdulmunaem and Salah's social class and their opposition to Yemeni paternalistic rights. The conflict was caused by the General's refusal to permit Abdulmunaem to marry Najla precisely because of the meat-cutter class to which Abdulmunaem and his family belong. Although the immediate cause of the General's anger was the defiance of his wishes through Abdulmunaem's secret marriage to Najla, the underlying cause of the General's wrath was his class prejudice. The affront to the General's honor was based on the fact that his daughter had run away with a lower-class man whom the General perceived to be unworthy. Thus, the BIA erred in finding that the sole motivation for the General's actions was his personal vendetta against Abdulmunaem and Najla for disobeying him.

Abdulmunaem and Salah added insult to injury by openly opposing Yemeni cultural traditions once the secret marriage was discovered. Yemeni society recognizes a father's right to control who his daughter marries and permits a father to punish—and even kill—those who defy this tradition and insult the family honor. Rather than giving up his marriage to Najla and submitting to the General's rights as Najla's father, however, Abdulmunaem took Najla to southern Yemen. Salah similarly refused to recognized the paternal rights of the General and would not disclose the location of Abdulmunaem and Najla, despite being detained and abused by the General's guards. Abdulmunaem's and Salah's refusal to submit to the paternalistic traditions of Yemen therefore gives the General further cause—recognized by Yemeni society—to kill the brothers. Indeed, the General has repeatedly made this very threat.

These facts, when viewed in "the overall context of the applicant[s'] situation," *Gilaj*, 408 F.3d at 285, demonstrate that the General's prejudice and traditional views underlay all of his actions. And because of the General's actions, Abdulmunaem and Salah were forced to choose between their fundamental values and their personal safety. One cannot fairly distinguish the General's personal vendetta from his prejudice and traditional views. The motivations are inextricably intertwined. Thus, the record

compels a finding that Abdulmunaem and Salah have proven the required nexus between the General's threats of death and their membership in a particular social group.

The BIA alternatively concluded that even if Abdulmunaem and Salah had demonstrated the requisite nexus, they had not established a clear probability of future persecution due to the unwillingness or inability of the government in Yemen to assist them. Abdulmunaem and Salah, according to the government, have waived any challenge to this finding because they "failed to challenge this aspect of the Board's decision" in their opening brief. To the contrary, Abdulmunaem and Salah expressly challenged this finding in their opening brief by stating that the BIA "made selective use of the country materials" and failed to properly consider their evidence of the conditions in Yemen. They argue that the BIA's finding that they could seek the assistance of the government in Yemen "does not even pass the 'giggle' test." Thus, Abdulmunaem and Salah have preserved this issue for review.

Contrary to the conclusion of the BIA, the record shows that Abdulmunaem and Salah could not reasonably expect the assistance of the government in Yemen. They contend, and the U.S. Attorneys Office does not apparently dispute, that the actions of General Abu Taleb are attributable to the Yemeni government. Even if this were not the case, Abdulmunaem and Salah have provided compelling evidence that the Yemeni government is unwilling or unable to control the General's actions. The General, for example, shot his own son, and Abdulmunaem testified that the General has never been prosecuted for this action. In addition, instead of protecting Abdulmunaem's mother from the General, the police actually helped the General break into her house. Salah was also detained in jail without charges for three months on the General's orders, to say nothing of his abuse by the General's guards. Although the BIA relied on the fact that a local district attorney was able to order Salah's release, the record shows that Salah was released only because the General had left the country to look for Abdulmunaem and Najla.

The BIA also gave great weight to the fact that Salah remained in Aden for several months before fleeing to the United States, and that Abdulmunaem, Salah, and

Najla were able to leave Yemen without being caught. At that time, however, the General was under the impression that they were in Saudi Arabia, and he was looking for them there. We therefore conclude that the points relied on by the BIA are unpersuasive.

In addition, the continuing safety of Abdulmunaem and Salah's other family members in Yemen does not have the significance that the BIA gave to this factor. These other family members did not seek to marry outside of their class, nor did they help Abdulmunaem marry Najla after the General refused to give his permission. As previously discussed, one of the characteristics of the social group to which Abdulmunaem and Salah belong is active opposition to the paternalistic marriage traditions in Yemen. The Al-Ghorbani family members not involved with Abdulmunaem's marriage to Najla do not share this characteristic. Their continued safety thus does not demonstrate that Abdulmunaem and Salah could return to Yemen without the likelihood of persecution.

To the contrary, the record contains ample evidence that the General will kill Abdulmunaem, Salah, and Najla if they are returned to Yemen, and nothing in the record suggests that conditions in Yemen have changed such that the government there will now be able to control the powerful General. The only way that Abdulmunaem and Salah were able to avoid being killed was through their escape from that country. Accordingly, the record compels a finding that Abdulmunaem and Salah have demonstrated a clear probability of future persecution in Yemen. They are therefore entitled to the withholding of removal. *See Zhu v. Gonzales*, 493 F.3d 588, 602 (5th Cir. 2007) (reversing the BIA's denial of the withholding of removal and remanding to the BIA "with instructions to enter an order withholding removal"); *Al-Harbi v. INS*, 242 F.3d 882, 894 (9th Cir. 2001) (same).

### III. CONCLUSION

For all of the reasons set forth above, we **DENY** review of the portion of Abdulmunaem and Salah's petition requesting asylum, but **GRANT** review of the portion of the petition requesting the withholding of removal. The case is therefore remanded to the BIA with instructions to enter an order withholding the removal of Abdulmunaem and Salah.