**NOT RECOMMENDED FOR PUBLICATION**
File Name: 12a0164n.06

**No. 10-3716**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| PJETER LLESHI, et al., | ) | |
| | ) | **FILED**<br>***Feb 08, 2012***<br>LEONARD GREEN, Clerk |
| Petitioners, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW OF AN |
| | ) | ORDER OF THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| ERIC H. HOLDER, JR., UNITED STATES | ) | |
| ATTORNEY GENERAL, | ) | |
| | ) | |
| Respondent. | | |

Before:  SILER and KETHLEDGE, Circuit Judges; ADAMS, District Court Judge.[*]

**SILER**, Circuit Judge.  Pjeter and Antoneta Lleshi petition for review of the order of the Board of Immigration Appeals ("BIA") upholding an Immigration Judge's ("IJ") denial of asylum. The Lleshis were initially granted political asylum by Judge Montante, an IJ from New York temporarily filling a vacant spot in Detroit.  Judge Montante granted the Lleshis asylum, in part, because he found that they proved a well-founded fear of future persecution.  The BIA remanded with instructions for the IJ to make findings on several specific issues.  On remand, the Lleshis conceded that, because of changed country conditions, they could not show a well-founded fear of future persecution, but they requested humanitarian asylum.  The IJ found, however, that they did

---

[*] The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

not meet the requirements for humanitarian asylum. The BIA affirmed. For the reasons stated

below, we **DENY THE PETITION FOR REVIEW**.

I.

The Lleshis and their two children entered the United States lawfully as non-immigrant

visitors and timely filed asylum applications. Both Antoneta and Pjeter were born in Albania. At

the age of sixteen, while living outside of an internment camp, Antoneta was raped by the son of a

local communist leader. Both Antoneta and Pjeter were members of groups that were disfavored by

the communist party then in power. Antoneta was a member of Omonoia, an ethnic Greek

organization, as well as a member of the Orthodox Church and an anticommunist group. Pjeter was

a Democratic Party activist. In 1990, Pjeter was arrested and severely beaten by the police. Antoneta

was arrested several times for participating in pro-democracy demonstrations and was once detained

by police for three days, during which time she was beaten and deprived of food.

In 1991, Pjeter witnessed events that led him to believe that the Democratic Party had

murdered several of its own members and had blamed the Socialist Party in order to have a "martyr."

After this incident, he feared for his life. So in 1995, the Lleshis moved to Greece. Antoneta and

the children were issued documents allowing them to live and work in Greece, but Pjeter received

only a tourist visa.

While in Greece, men that the Lleshis believed to be members of the Albanian secret police

came to their home looking for Pjeter on two occasions. The first time Pjeter was absent, and the

men beat Antoneta before leaving. The second time Pjeter was home, and when he refused to leave

with the men, they hit him in the back of the head with a metal rod. This caused him to fall into a

coma, and he still suffers memory problems and has difficulty making everyday decisions due to this head trauma. In 1998, Pjeter heard that another member of the Democratic Party had been killed in connection with the events of 1991. He began to fear for his safety even in Greece, and in 1999, he entered the United States. Antoneta and the children followed two years later, and the family applied for asylum.

IJ Montante granted the Lleshis asylum. He found that Antoneta was raped on account of protected grounds, that the Lleshis had suffered past persecution, and that they had a well-founded fear of future persecution. The BIA remanded the case with instructions for the IJ to make specific and separate findings regarding: 1) past persecution for each Petitioner; 2) changed country condition evidence in Albania; 3) firm resettlement; and 4) humanitarian asylum. It directed the IJ on remand to hold "further proceedings consistent with the foregoing opinion and the entry of a new decision."

On remand, Judge Nettles presided as the newly appointed IJ in the Detroit seat. The Lleshis' attorney rested primarily on the evidence already in the record, but he did introduce the additional testimony of a medical doctor in support of his argument that the Petitioners should receive asylum on humanitarian grounds. During the hearing, the attorney for the government questioned Antoneta and Pjeter. Judge Nettles issued a new opinion and found that there was no nexus between the rape and a protected ground but that Antoneta had nonetheless suffered past persecution. The IJ held that any past persecution the Lleshis experienced was not severe enough to warrant a grant of humanitarian asylum.

The BIA found that the IJ erred in holding that Antoneta and the children had firmly resettled in Greece but affirmed on all other grounds. The Lleshis also filed a motion to remand, claiming

new evidence that Antoneta had been involuntarily committed to a psychiatric hospital for thirty days warranted reconsideration of their petition. They believed the hospitalization was a result of the past persecution she experienced in Albania and that it should be considered as evidence that she would experience "other harm" in the form of inadequate medical care if ordered to return to Albania. The BIA denied this motion, finding that there was no evidence to support a connection between the hospitalization and past persecution and that the hospitalization did not provide a sufficient basis for concluding that she would suffer "other serious harm" if she is removed to Albania. In this petition, the Lleshis argue that the BIA failed to consider whether they are entitled to humanitarian asylum based on "other serious harm" and also raise several due process arguments.

## II.

"Where, as here, the BIA reviews the IJ's decision and issues a separate opinion, rather than summarily affirming the IJ's decision, we review the BIA's decision as the final agency determination." *Al-Ghorbani v. Holder*, 585 F.3d 980, 991 (6th Cir. 2009). "To the extent that the BIA has adopted the IJ's reasoning, however, we also review the IJ's decision." *Id.* Questions of law are reviewed *de novo*, and "'administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id*. (quoting 8 U.S.C. § 1252(b)(4)(B)). A discretionary denial of asylum should not be disturbed unless manifestly contrary to the law and an abuse of discretion. 8 U.S.C. § 1252(b)(4)(C) and (D).

## III.

Petitioners raised a number of procedural challenges on appeal to the BIA and assert them again now. However, Petitioners cannot show that a due process violation occurred. We review *de*

*novo* alleged procedural violations in removal hearings. *Preducaj v. Holder,* 379 F. App'x 508, 510 (6th Cir. 2010).

A.

The Petitioners argue that it was reversible error for a different judge to preside over the case on remand. The BIA held that "no error occurred, and the respondents were not prejudiced, by the reassignment of this matter to a different Immigration Judge." While it may be the general practice of the immigration court to assign remanded cases to the same judge who presided originally, in this case the original judge was a visiting judge from New York who was temporarily filling the vacancy later permanently filled by Judge Nettles. Petitioners fail to cite any authority for their proposition that it was error not to assign the case on remand to a New York judge. Furthermore, they cannot establish that they were prejudiced by a different judge presiding on remand.

B.

The Lleshis also argue that the IJ "took such an active role in questioning the witnesses that she became a second advocate for ICE." However, IJs have "broad discretion in conducting their hearings," and "mere intimidation or interruption by a judge does not render a hearing unfair." *Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005). The Lleshis cite *Castilho de Oliveira v. Holder*, 564 F.3d 892 (7th Cir. 2009), in support of their argument that Judge Nettles's behavior during the hearing demonstrated bias. The record in this case simply does not contain the type of inappropriate behavior that occurred in *Castilho de Oliveira*. Judge Nettles questioned the witnesses in an attempt to gain more information. She asked relevant questions and was not demeaning or belittling in any way.

Petitioners note, without developing an argument on the matter, that Judge Nettles "served as ICE Chief Counsel during the prior proceedings." This statement is misleading. While she may have served as ICE's Chief Counsel while the prior proceedings were pending, she did not represent the government in this particular case or even approve the appeal. During the hearing, Judge Nettles stated that she had no independent recollection of the parties, and attorneys for both sides agreed that they did "not have any information in [their] file[s] indicating that [she] need[ed] to recuse []."

C.

Next, the Lleshis argue that Judge Nettles "exceeded her authority on remand." They seem to argue that the IJ improperly considered additional material on remand, yet they also state, "ICE did not offer new evidence or advance new arguments," and "[e]verything presented on remand was presented in the prior proceedings through testimony or documentary evidence." Interestingly, Petitioners themselves introduced "new" testimony on remand by calling Dr. Goldberg to testify as a treating physician. Thus, any argument that the IJ improperly considered additional testimony or evidence on remand is not well taken.

The crux of Petitioners' argument is their contention that Judge Nettles did not have the authority to reach any different conclusions than Judge Montante. The wording of the BIA's opinion does not support this contention. Notably, the BIA did not remand for the IJ to *explain* his findings. On remand, the IJ was to "*make* specific findings." Petitioners cite *In re M-D-*, 24 I. & N. Dec. 138 (BIA 2007), in support of their argument that the IJ was not free to "reconsider the previous decision." In that case, however, the court noted that on remand, the IJ was not free to reconsider the decision of the *BIA*; it did not address whether the IJ, on remand, could reconsider the original

opinion. Here, Judge Nettles did not reconsider the BIA's decision. Instead, she followed its instructions to make specific findings and issue a new opinion.

IV.

Next, we consider whether the BIA erred in affirming Judge Nettles's holding that the Petitioners are not entitled to humanitarian asylum. In this case, there is no question that the government rebutted the presumption of well-founded fear with evidence of changed country conditions. However, even where there is no well-founded fear of future persecution, an applicant may receive a grant of humanitarian asylum if he has demonstrated either: 1) "compelling reasons for being unwilling or unable to return to the country arising out of the severity of past persecution" or 2) that there is a "reasonable possibility that he or she may suffer other serious harm upon removal." 8 C.F.R. § 1208.13(b)(1)(iii).

A.

Judge Montante found that the Petitioners had experienced past persecution, but he did not consider whether the persecution was severe enough to warrant a grant of humanitarian asylum. Thus, the BIA instructed the IJ to consider the issue on remand. Judge Nettles found that the circumstances in this case did not give rise to a humanitarian grant of asylum. She focused on the severity of past persecution that the Petitioners experienced and compared their situation to *In re N-M-A-*, 22 I. & N. Dec. 312, 324 (BIA 1998).

Petitioners argue that both the IJ and the BIA should have considered the rape when weighing the severity of past persecution. Because Judge Nettles found, and the BIA agreed, that there was not a sufficient nexus between the rape and protected grounds, "the rape's relevance to a

humanitarian grant of asylum is reduced." The record supports Judge Nettles's finding on this matter. Antoneta never indicated that the rape was because of her political beliefs or any other protected ground. The mere fact that the perpetrator was a communist is not enough on its own to establish the required nexus. Thus, Antoneta has not provided evidence "from which it is reasonable to believe that the harm was . . . motivated in part by an actual or imputed protected ground." *See Matter of J-B-N & S-M-*, 24 I. & N. Dec. 208, 211 (BIA 2007).

Both the IJ and the BIA correctly noted that humanitarian asylum grants on account of past persecution are reserved for only the most severe cases and should only be granted if the "past persecution was so severe that returning the alien to his or her native country would be inhumane." *Klawitter v. I.N.S.*, 970 F.2d 149, 153 (6th Cir. 1992). In sum, humanitarian asylum due to severe persecution is "reserved for extreme cases, such as 'for the case of the German Jews, the victims of the Chinese 'Cultural Revolution', [and] survivors of the Cambodian genocide.'" *Hana v. Gonzales*, 157 F. App'x 880, 884 (6th Cir. 2005) (quoting *Bucur v. I.N.S.*, 109 F.3d 399, 405 (7th Cir. 1997)). The BIA did not abuse its discretion in denying Petitioners humanitarian asylum on these grounds.

B.

Finally, Petitioners argue that their case should be remanded because the IJ did not specifically address the issue of whether they qualify for a humanitarian grant of asylum due to "other harm" they may face in Albania. Petitioners also allege that the BIA "failed to consider whether they are entitled to humanitarian asylum because of the reasonable possibility that they will suffer other serious harm in Albania" but that Judge Montante "concluded that they would." Both statements are inaccurate. Nowhere in Judge Montante's opinion does he discuss the standard for

humanitarian asylum or how the standard applies to the facts in this case. His opinion does make a vague reference to "humanitarian reasons" for granting the Lleshis political asylum, but to say that he found that they were entitled to humanitarian asylum– on any grounds– is overreaching.

Additionally, despite Petitioners' contentions to the contrary, the BIA specifically addressed the "other harm" argument and found that the "crime, corruption, and poverty that plague Albania . . . are not sufficient . . . to warrant a humanitarian grant of asylum." It also held that concerns that the family would be separated, Antoneta's (then) recent hospitalization, and the poor mental health system in Albania did not provide a basis for a humanitarian grant of asylum "based on the likelihood of the respondent suffering other serious harm if [] removed to Albania."

Persecution is "'more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty,'" and even the presence of "'*some* physical harm may not be sufficient.'" *Haider v. Holder*, 595 F.3d 276, 286 (6th Cir. 2010) (quoting *Mikhailevitch v. I.N.S.*, 146 F.3d 384, 389 (6th Cir. 1998), and *Kane v. Gonzales* 236 F. App'x 178, 182 (6th Cir. 2007)). Additionally, "economic stratification and deficient government support, regrettable though they are, do not establish a cognizable case of persecution." *Pascual v. Mukasey*, 514 F.3d 483, 488 (6th Cir. 2007). The Lleshis list discrimination, inferior education, risk of kidnapping and trafficking, police corruption, and inadequate medical care as examples of the types of "other harms" they may face upon return to Albania. These are not only highly speculative and general, but they are also insufficient to warrant a grant of humanitarian asylum.

Petitioners place reliance on *Kholyavskiy v. Mukasey*, 540 F. 3d 555 (7th Cir. 2008), for their argument that they– particularly Antoneta, who has been hospitalized for psychiatric reasons– have shown they will suffer "other harm" if deported. In *Kholyavskiy*, the "other harm" the alien faced was being both debilitated and homeless. *Id*. at 577. The Lleshis have made no argument or showing that they would be either. The BIA considered both possible grounds for humanitarian asylum (the severity of past persecution and "other harm"), and substantial evidence supports its conclusion.

**PETITION FOR REVIEW DENIED**.