**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0618n.06

**Nos. 13-3589/4119**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>ANEES MOUSTAFA FAHMY,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Petitioner,</td><td>)</td><td>ON  PETITION  FOR  REVIEW</td></tr>
<tr><td></td><td>)</td><td>FROM THE BOARD OF</td></tr>
<tr><td>v.</td><td>)</td><td>IMMIGRATION APPEALS</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>ERIC H. HOLDER, JR.,</td><td>)</td><td>**O P I N I O N**</td></tr>
<tr><td>Attorney General,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Respondent.</td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
</table>

**FILED**
Aug 13, 2014
DEBORAH S. HUNT, Clerk

**Before:** **GIBBONS and McKEAGUE, Circuit Judges; and LAWSON, District Judge.**[*]

**DAVID M. LAWSON, District Judge.** Anees Moustafa Fahmy, an Egyptian citizen, seeks review of the denial by the Board of Immigration Appeals (BIA) of his motion to reopen and the denial by an immigration judge (IJ) of his petition for withholding of removal under the Immigration and Nationality Act ("INA") and the Convention Against Torture ("CAT"), resulting in a final order of removal by the BIA. Fahmy contends that he would be persecuted if he returned to Egypt because of his mental illness and the political activities of his uncle, who died in 1987. Because we find that the decision of the IJ as supplemented by the BIA's decision is supported by substantial evidence, we deny the petitions.

---

[*] The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

## I. Facts and Proceedings

### A. Background

Fahmy, a 41-year-old citizen of Egypt, was admitted to the United States as a non-immigrant visitor on June 24, 1995. His parents and two brothers are United States citizens. He overstayed his visa. Fahmy concedes that he is removable, but he contends that he should not be sent back to his country of citizenship, because he likely will be tortured if he returns. His fear is based in part on his mental illness, which emerged when he was 17 years old, but is presently under control with the benefit of a prescription drug that is not available in Egypt. Fahmy believes that if he relapses, he will be detained by Egyptian authorities and subjected to intolerable conditions of confinement. He also fears that Egyptian authorities will seek retribution against him because of the activities of his uncle, a journalist and political activist, who was imprisoned in Egypt for 17 years and tortured because of his political beliefs. Fahmy contends that his uncle's treatment at the hands of a prior Egyptian regime hastened his death in 1987.

An immigration judge (IJ) ordered Fahmy removed *in abstentia* in January 2000 because he overstayed his non-immigrant visa in violation of INA section 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). Another IJ vacated that order in 2010 because Fahmy's failure to appear for his hearing was due to his involuntary commitment to a mental health institution before the scheduled hearing. After conceding removability, Fahmy sought relief from removal in July 2010 in the form of withholding of removal and protection under Article III of the CAT.

Fahmy's mental illness is well documented. At the merits hearing, Dr. Victor Ajluni, a practicing psychiatrist, testified that he diagnosed Fahmy with paranoid schizophrenia, a condition

that causes delusions and hallucinations and may lead a person to harm himself or others. Dr. Ajluni explained that Fahmy has suffered from these symptoms in the past but is currently stable because "he has a family that cares for him" and is treated with the prescription drug Seroquel. The medicine has allowed Fahmy to maintain employment, and Dr. Ajluni said that he would relapse if he were to stop taking Seroquel. Dr. Ajluni did not have any particular specialized knowledge about care in Egypt, but a colleague told him that Seroquel is not available in Egypt, which he confirmed through online research. He did not know whether Fahmy could be treated successfully with any other medication if Seroquel were unavailable.

Fahmy testified that he was born in Kuwait, visited Egypt during the summers, and went to college in Egypt for three to four years. His mental illness, he said, first appeared when he was 17 years old while living in Kuwait. He began to hear voices in his head and had "weird thoughts" that affected his behavior and attitude. Fahmy was hospitalized for a few days until he "came back to [his] senses," and then was released from the hospital.

Fahmy said that his first "main episode" from schizophrenia took place in 1999 while he was living with his parents in Lansing, Michigan. He said that he had heard voices for days, which told him that he was an FBI agent and was supposed to arrest somebody. At a Meijer's department store, where he had worked, Fahmy approached a random individual, identified himself as an FBI agent, and told the individual that he was under arrest. He grabbed the individual by the arm and escorted him toward the exit until store employees intervened and calmed Fahmy down. Local police soon arrived and placed Fahmy under arrest. Fahmy was transferred to a mental health facility, where he was first diagnosed with paranoid schizophrenia.

Fahmy testified that he continued to hear voices, but was able to maintain employment. However, he relapsed and was hospitalized after he lost his job and health insurance. This was the first of three separate hospitalizations over the next several years. On two occasions, Fahmy turned himself in to immigration authorities in New York and Detroit because he believed it was "wrong for me to stay here in the United States illegally" and "wanted to get that off my conscience." In New York, he was transferred to Bellevue Hospital for mental health treatment. In Detroit, immigration officials "kick[ed] [him] out of the Immigration office . . . and [told him] not to come back." His last major episode occurred in 2004 when Fahmy was transferred to Heritage Hospital in Detroit.

Fahmy also described several episodes that occurred before he arrived in the United States. Once when he was 17 years old in Kuwait, he "wanted to live like people used to live in the past," so he stopped eating, talking, and taking medication, and walked in the desert for forty kilometers until he came upon some Bedouin people and decided to return home. Fahmy also said that he jumped off a bridge in Cairo, Egypt in 1994. Although the authorities saw him jump off the bridge, they did not detain him.

Fahmy also explained that the Egyptian police arrested his uncle, Ismael Almahdawy, a well-known journalist in Egypt, and prosecuted and tortured him after he criticized the government. Fahmy also testified that his cousin (his uncle's son) was tortured and beaten by the Egyptian army after they learned that his cousin shared similar political views as his father.

Fahmy reported that his sister still lives in Egypt with her husband and three children. She has never been tortured or prosecuted. Notably, she is married to a pharmacist, who told Famhy that

4

his medication, Seroquel, is not available there. Fahmy said that he would only be able to live with her temporarily because her husband had been diagnosed with hepatitis C, which is not being properly treated.

Anissa Abdelhaleem Almahdawy and Mostafa Ali Fahmi, Fahmy's mother and father, confirmed much of Fahmy's testimony. Anissa explained that her family moved to Kuwait to avoid torture in Egypt due to the political opinions of her brother, Ismael Almahdawy. Ismael passed away in 1987 after spending between 17 and 20 years in prison and mental institutions. Mostafa said that Ismael, a communist, was followed and persecuted in Egypt because he advocated the overthrow of the Egyptian government. Anissa said that Ismael received electrical shocks, which made him the "same as an animal." Anissa also testified that her nephew, Ismael's son, started "acting weird" when he began mandatory military services and the authorities tortured him because of his behavior. However, Anissa acknowledged that she never experienced any harm from the government when she lived in Egypt, although she lived in fear until she left in 1960.

The IJ also considered written evidence, including documentation of Fahmy's mental illness and treatment, declarations from his psychiatrist and family members, and two reports from Amnesty International that address human rights abuses in Egypt after the ouster of former President Hosni Mubarak. One, "Time for Justice," reported that the Egyptian prison system was plagued by inadequate medical care and poor living conditions, and that detainees experience torture and severe physical and psychological mistreatment. The report did not address police or prison officials' attitudes or behavior toward the mentally ill. Fahmy also submitted documentation about his uncle's

mistreatment and death, including articles in Egyptian newspapers describing his past mistreatment due to his political activism.

## B.  Immigration Judge's Decision

The IJ found Fahmy's testimony credible as well as the testimony of his mother, father, and psychiatrist.  He also found that Fahmy is a member of social groups consisting of mentally ill Egyptians and his family.  The IJ recognized that Fahmy needed Seroquel to treat his severe mental illness but found no evidence that the Egyptian government did anything to make that drug unavailable there.  He also pointed out that the Egyptian government was taking steps to address the inadequate medical care provided to administrative detainees.

The IJ also found that Fahmy did not show that any family member was ever tortured or persecuted in Egypt based upon the involvement of his uncle or cousin and their opposition to the government of Egypt.  The IJ noted that Fahmy has spent time in Egypt without any persecution or torture based upon his mental illness or his relationship with his family.  There was no evidence that anyone connected to the Egyptian government would torture him if he returned to Egypt.  Therefore, he denied relief.

## C.  The BIA Decisions

The BIA agreed with the IJ that "the country conditions evidence in the record does not establish that the respondent is more likely than not to be persecuted on account of his mental illness or his family ties in Egypt."  Although long-term prisoners receive inadequate medical care and may face torture or other ill-treatment, the BIA found that Fahmy failed to establish that he is likely to be detained if he returns to Egypt.  First, there was insufficient evidence that the unavailability of

Fahmy's medication will result in his detention and mistreatment. Although the BIA noted the existence of inadequate medical treatment in detention facilities in Egypt, it found that the record does not establish that such harm is "sufficiently widespread" such that Fahmy was more likely than not to be tortured. Second, Fahmy did not establish that he was politically active or that he would be sought "fifteen years" after his uncle's death on account of his family ties. The BIA upheld the IJ's decision.

On July 22, 2013, Fahmy filed with the BIA a timely motion to reopen, arguing that conditions in Egypt have changed. He cited the military's removal of a democratically-elected president, which resulted in significant deterioration in the country. Fahmy argued that the political breakdown in Egypt would make it more difficult for him to receive adequate medical treatment and, as a result, he would be more susceptible to persecution or torture if he returned to Egypt.

The BIA denied Fahmy's motion to reopen. Although it recognized the existence of "general violence" in Egypt relating to the overthrow of the Muslim Brotherhood government by the military, the BIA found that the political and social unrest presently extant in Egypt approximate the same conditions that existed at the time of Fahmy's 2012 hearing. The BIA also concluded that Fahmy failed to establish "exceptional circumstances" warranting the BIA to reopen his case on its own motion.

Famhy timely filed a petition for review of the denial of his requests to withhold removal under the INA and CAT, and the denial of his motion to reopen his proceedings. We consolidated both petitions in this appeal.

## II. Discussion

Where, as here, the BIA incorporated the IJ's decision into its own decision, the Court reviews the decision of the IJ, as supplemented by the BIA, as the final administrative order. *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007). Factual findings "must be sustained if the determination is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Kaba v. Mukasey*, 546 F.3d 741, 747 (6th Cir. 2008) (quoting *INS v. Elias–Zacarias*, 502 U.S. 478, 481 (1992)); *see also* 8 U.S.C. § 1252(b)(4)(B) (stating that the IJ's factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). The IJ's application of legal principles to undisputed facts is reviewed *de novo*. *Mapouya v. Gonzales*, 487 F.3d 396, 405-06 (6th Cir. 2007).

### A. Withholding of Removal

"To establish a claim for withholding of removal under section 2[3]1(b)(3)(A) of the Act, an applicant must demonstrate a clear probability that his life or freedom would be threatened in the country directed for removal on account of his race, religion, nationality, membership in a particular social group, or political opinion." *Shan Sheng Zhao v. Holder*, 569 F.3d 238, 245 (6th Cir. 2009) (citing *INS v. Stevic*, 467 U.S. 407, 430 (1984)); *see also Khozhaynova v. Holder*, 641 F.3d 187, 192-93 (6th Cir. 2011). Persecution is defined as "'the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim.'" *Urbina-Mejia v. Holder*, 597 F.3d 360, 364-65 (6th Cir. 2010) (quoting *Khalili v. Holder*, 557 F.3d 429, 436 (6th Cir. 2009)).

The IJ found, and the BIA affirmed, that Fahmy is a member of two particular social groups: his family and those suffering from mental illness in Egypt. Membership in the same family "is widely recognized by the caselaw" as a particular social group. *Al-Ghorbani v. Holder*, 585 F.3d 980, 995 (6th Cir. 2009) (collecting cases). Although we have "question[ed] whether mentally ill persons constitute a particular social group," *Berisha v. Holder*, 558 F. App'x 555, 556 (6th Cir. 2014) (per curiam), we need not discuss the point at length because substantial evidence supports the IJ's finding that Fahmy did not establish a clear probability of persecution on account of his family or mental illness.

The BIA found that Fahmy failed to show a likelihood that the Egyptian authorities would persecute him based on his relationship to his uncle or cousin. Fahmy's disagreement is based on the fact that Egyptian authorities tortured his uncle and cousin because of their political opinions. However, the record does not "compel[]" a "reasonable adjudicator" to subscribe to the view that Fahmy himself will be persecuted, 8 U.S.C. § 1252(b)(4)(B); to the contrary, the record contains substantial evidence to support the BIA's finding. There is no evidence that Fahmy or his immediate family have experienced any persecution based on his uncle's political views. Fahmy lived in Egypt for three or four years while attending college and did not experience any persecution on account of his uncle's political opinions. Fahmy's father visited Egypt in 2006 without facing any persecution and his sister, brother-in-law, and their children live in Egypt currently and have never experienced any harm. Additionally, Fahmy's uncle died over 25 years ago and faced persecution under a different regime. And there is no evidence that Fahmy shares his uncle or cousin's political views.

9

Substantial evidence also supports the BIA's finding that Fahmy did not establish a likelihood of persecution by Egyptian authorities because of his mental illness. Fahmy's main argument is that his critical medication, Seroquel, is unavailable in Egypt, and therefore he likely will relapse and subject himself to heightened scrutiny by the Egyptian authorities, and then face arrest and detention for his "weird" behavior. But there is no evidence in the record that the Egyptian government is denying Seroquel to people with paranoid schizophrenia in order to persecute the mentally ill and Fahmy conceded that the unavailability of the drug had nothing to do with him personally. "Because a critical element of persecution is motive, a petitioner 'must provide *some* evidence of it, direct or circumstantial.'" *Al-Ghorbani*, 585 F.3d at 997 (quoting *Elias-Zacarias*, 502 U.S. at 483). The absence of any evidence of motive is fatal to Fahmy's claim. *See Kholyavskiy v. Mukasey*, 540 F.3d 555, 573-74 (7th Cir. 2008) (finding that the petitioner failed to establish that the unavailability of Paxil and Klonopin in Russia was the result of the Russian government's attempt to injure the petitioner or, more generally, individuals with mental illness); *Soobrian v. Atty. Gen. of U.S.*, 388 F. App'x 182, 191 (3d Cir. 2010) (holding that the petitioner did not establish grounds for withholding of removal because "the alleged persecution appears to be a simple lack of resources for the mentally ill in Guyana, not an intent on the part of the government to persecute mentally ill persons.").

Moreover, Fahmy's fear of arrest and detention if he exhibits symptoms of mental illness is highly generalized. A generalized fear will not establish the threat to an alien's life or freedom that section 231(b)(3)(A) requires. *Cf. Dieng v. Holder*, 698 F.3d 866, 872 (6th Cir. 2012) (holding that to qualify for asylum, "[t]he fear of future persecution must be based on reasonably specific

information showing a real threat to individual persecution, not mere assertions of fear of possible persecution or speculative conclusions" (quoting *Mapouya*, 487 F.3d at 412)). There is no evidence in the record that Egyptian authorities routinely arrest and detain people with mental illness. To the contrary, Egyptian authorities observed Fahmy jump off a bridge during a schizophrenic episode while he attended college in Egypt, but did not arrest or detain him.

Substantial evidence supports the BIA's decision to deny Fahmy withholding of removal under section 1231(b)(3)(A).

## B. Convention Against Torture

The CAT provides protection to individuals facing removal who are likely to be tortured if returned to their home country. To prevail on a claim under the CAT, the petitioner must prove that it is more likely than not that he will be tortured if removed to the designated country. 8 C.F.R. § 208.16(c)(2); *Ramaj v. Gonzales*, 466 F.3d 520, 532 (6th Cir. 2006). The regulations define torture as the intentional infliction of pain or suffering "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity" for a variety of purposes, such as coercing a confession, or as punishment for an act, or due to discrimination. 8 C.F.R. § 208.18(a)(1). "'An applicant for relief need not show that the harm she [or he] faces is based on one of the five grounds . . . required under the INA, but rather must establish a *particularized* threat of torture.'" *Bi Xia Qu v. Holder*, 618 F.3d 602, 610 (6th Cir. 2010) (quoting *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1155 (6th Cir. 2010)). "'Torture,' in any of its myriad manifestations, must entail the intentional infliction of severe mental or physical pain upon an individual . . . ." *Alhaj v. Holder*, 576 F.3d 533, 539 (6th Cir. 2009) (citation omitted).

Fahmy argues that detainees in Egypt face torture. However, he has not established that it is more likely than not that Egyptian authorities will detain him. There is simply no evidence in the record that Egyptian authorities respond to mental illness through incarceration rather than treatment.

Even if Fahmy were detained, there is no evidence in the record that Egyptian authorities target mentally ill inmates for torture. Although prison conditions in Egypt may be poor, the reports in the record do not indicate that mentally ill inmates are singled out for torture for discriminatory reasons or as a form of punishment. *See Lysaire v. Att'y Gen. of U.S.*, 368 F. App'x 329, 331 (3d Cir. 2010) (per curiam) (holding that the petitioner with mental illness did not qualify for relief under the CAT because all detainees experienced "terrible" prison conditions, which were not targeted at mentally ill people); *Cherichel v. Holder*, 591 F.3d 1002, 1017 (8th Cir. 2010) (holding that detention in "squalid, overcrowded cells without adequate food, water, sanitation, exercise, or medical treatment" in Haitian prisons does not constitute torture under CAT because there is no evidence that Haitian authorities have the specific intent to inflict pain or suffering); *Villegas v. Mukasey*, 523 F.3d 984, 988-89 (9th Cir. 2008) (stating that although Mexican mental patients are "housed in terrible squalor," there is no evidence that Mexican officials created those conditions for the specific purpose of inflicting suffering upon the patients and not because of "historical gross negligence and misunderstanding of the nature of psychiatric illness"). The BIA's decision to deny relief under the CAT is supported by substantial evidence.

## C. Motion to Reopen

We review the BIA's denial of a motion to reopen for abuse of discretion. *Liu v. Holder*, 560 F.3d 485, 489 (6th Cir. 2009). An abuse of discretion occurs if the decision to deny a motion to reopen "'was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group.'" *Id.* at 490 (quoting *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005)). The Attorney General's discretion to reopen a matter is "broad." *INS v. Doherty*, 502 U.S. 314, 323 (1992). The evidence sought to be offered at the reopened proceeding must be "material and . . . not available and could not have been discovered or presented at the former hearing." *Sako v. Gonzalez*, 434 F.3d 857, 863 (6th Cir. 2006) (quoting *Allabani*, 402 F.3d at 675).

In his motion, Fahmy argued that the BIA should reopen his case because political conditions in Egypt, including the overthrow of the democratically elected president, would make it more likely that he would not receive the medical care that he needs. The BIA reasoned that the evidence that Fahmy submitted with his motion — documenting political and social unrest in Egypt — was similar to the evidence that he submitted during his removal proceedings. The BIA concluded that Fahmy's evidence did not alter Fahmy's fear of harm based on his mental illness or his uncle's political activity and, accordingly, found that the evidence would be unlikely to change its determination that Fahmy was ineligible for withholding of removal. Fahmy has offered no evidence that the BIA's conclusion was "arbitrary, irrational, or contrary to law." *Daneshvar v. Ashcroft*, 355 F.3d 615, 625-26 (6th Cir. 2004).

### III.  Conclusion

For the foregoing reasons, the petitions for review are **DENIED**.