NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0292n.06

No. 22-3643

## UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

FILED
Jun 23, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| RIQUELMER LEONARDO LOPEZ GARCIA, | ) | |
| Petitioner, | ) ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| MERRICK B. GARLAND, Attorney General, | ) ) | |
| Respondent. | ) | OPINION |
| | ) | |

Before: WHITE, THAPAR, and NALBANDIAN, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Riquelmer Leonardo Lopez Garcia seeks asylum, withholding of removal based on his membership in a particular social group, and relief under the Convention Against Torture (CAT). As for his asylum and withholding claims, the Immigration Judge (IJ) denied his application because she found him not to be credible and because his social group was non-cognizable. And she found that he failed to submit sufficient evidence to show that he was eligible for CAT relief. Assuming Lopez Garcia's credibility, the Board of Immigration Appeals (BIA) affirmed based on the IJ's other reasons. Lopez Garcia appeals the BIA's decision. Because the BIA correctly found Lopez Garcia's particular social group non-cognizable, and because we find his CAT claim to be meritless, we **AFFIRM** the denial of Lopez Garcia's petition.

**I.**

**A.**

Lopez Garcia was born in Guatemala in 1999. He lived there until the age of 17, when he entered the United States. Upon his arrival at the California border in November 2016, Lopez Garcia turned himself into Border Patrol and told them that a Guatemalan gang had tried to recruit him and had "threatened him about nine times." (A.R. 9-2, Page 000130, 196). Lopez Garcia planned to stay with his father, who was already living in Michigan. He was given a notice to appear and was released to his father.

Lopez Garcia applied for asylum, withholding of removal, and relief under the CAT. In his application, Lopez Garcia claimed that armed and tattooed men had kidnapped him and his friend. After the friend told the gang members that Lopez Garcia's father was in the United States, they demanded that he give them his father's phone number, presumably so that they could extort money from Lopez Garcia's father. When Lopez Garcia refused, they threatened to kill him and his family. He claimed that the gang members "gave [him] a gun and told [him] to find the money" and that "almost every 15 days [he] would give them money." (*Id.* at Page 000603). And he claimed that he feared being kidnapped, tortured, and murdered if returned "precisely because [he] stopped paying them and escaped to [the] United States." (*Id.*).

**B.**

On May 24, 2019, Lopez Garcia had a hearing before an IJ on his claims. Before Lopez Garcia testified, his attorney identified his particular social group as "young Guatemalan males who are perceived to be wealthy because they have family in the United States, and as a result, are extorted by gang members." (*Id.* at Page 000125).

Lopez Garcia testified. His story contained some notable contradictions. He told the IJ that gangs tried to recruit him nine times since he was fifteen. But their efforts to extort him only began when he and his friend entered a car, where two men seated inside began to demand money. Rather than describe this as a kidnapping, as he had done in his asylum application, Lopez Garcia stated that he and his friend entered the car willingly, "not by force, just because my friend said, 'Let's go.'" (*Id.* at Page 000133). He claimed the men in the car threatened to hurt his sisters if he didn't pay. Lopez Garcia claimed that the gang members had "investigated that [he had] family [in the United States], and they knew that [his] parents were [there]." (*Id.* at Page 000134). He believed his friend had told them this information.

Lopez Garcia testified that after threatening him and demanding money, the gang members gave him a gun to shoot anyone who might get in the way of him collecting money. He could not collect the money his parents sent because it went to his grandmother. So he "had to go into [his] aunt's house to get the money." (*Id.* at Page 00136). He knew he would find money there because his aunt ran a church and had a store in Mexico and she left her money in her closet. Lopez Garcia testified that he stole money "[f]our or five times" rather than ask his aunt for it because "she would have went to the police, but the police wouldn't have done anything right away." (*Id.* at Page 000138). He brought the gun with him when he took money from his aunt. Lopez Garcia testified that when his aunt found out he stole her money, she was at first angry. But after he explained what happened, his aunt told him to "just stay in the house" for about a week, after which time she gave him money to go to Mexico. (*Id.* at Page 000142).

Lopez Garcia stated that he had "[a] lot of fear" that he would be harmed if he returned to Guatemala. (*Id.*). He claimed the gangs had threatened to torture him and to cut out his tongue if

he didn't turn in the money on time. And he didn't think the police could help him because "the gangs have more guns than the police." (*Id.* at Page 000145)

Lopez Garcia's aunt sent a letter in support of his application for asylum. She claimed that "moments after my nephew did not present economic resources, he was brutally assaulted, [and] threatened, by the group of gang members." (*Id.* at Page 000586). But Lopez Garcia stated at the hearing that the gangs had not physically harmed him. (*Id.* at Page 000155). He also stated that while his siblings had not had problems with the gangs since he left, this was because they never left the house. He testified that his father was "paying [his] uncle to take care of them," including "paying them to always be in the house and to make sure that they don't go out in the street." (*Id.* at Page 000171). According to Lopez Garcia, "it's been a year since they stopped going to school." (*Id.*) And the house was secure because his father paid his uncle to put up a fence around the house, which had "recently" been installed. (*Id.* at Page 000171–72).

Lopez Garcia's attorney reiterated that Lopez Garcia's particular social group was "young Guatemalan males who are perceived to be wealthy because they have family in the United States and, as a result, are extorted by gang members." (*Id.* at Page 000175). The IJ asked about this categorization, asking how to distinguish it from categories the Sixth Circuit had found non-cognizable, including "people returning from the United States who are perceived as having wealth" or "business owners who are perceived as having money." (*Id.* at Page 000176). Lopez Garcia's attorney emphasized that his client was also a young male and argued that the "combination of the two" characteristics made his particular social group cognizable." (*Id.* at 000176–77).

## C.

The IJ denied Lopez Garcia's petition. She found his testimony not to be credible for four reasons. First, she found that his testimony that he had never been physically harmed by the gangs directly conflicted with his aunt's written statement that he had been "brutally assaulted" by the gang. (*Id.* at Page 000098). Second, she found that his testimony that he fled extortion contradicted his testimony before Border Patrol that he had been recruited by the gang nine times and was fleeing recruitment. And she rejected counsel's suggestion that Lopez Garcia was repressing memories of his gang interactions as "laughable and entirely speculative." (*Id.* at Page 000099). Third, she found it implausible that the gang would give Lopez Garcia the gun which he carried with him when he robbed his aunt unless he was a member of the gang. She found it particularly noteworthy that Lopez Garcia's family remained unharmed in Guatemala. Without corroborating evidence, she was unconvinced that Lopez Garcia's siblings lived "in virtual house arrest," finding it more likely that Lopez Garcia had "not been candid with the Court about his gang membership and that he has made up information concerning his family that continues to live in Guatemala." (*Id.*). Fourth, she rejected the contention that Lopez Garcia's "age and the trauma of dealing with the gang affected his ability to give truthful, unembellished testimony to the Court" and concluded "that these factors did not adversely affect his testimony." (*Id.* at Page 000099-100).

Besides finding Lopez Garcia not credible, the IJ found that he had failed to identify a particular social group. This was because the group "young Guatemalan males marked as wealthy because they have family members in the United States and are, therefore, extorted by gang members" was "not cognizable because it is defined by the persecution." (*Id.* at Page 000100). And she found the group not to be "socially salient" and to be "indistinguishable from the general

population of Guatemala who are victims of gang extortion." (*Id.*). She found the group to be similar to other groups that the Sixth Circuit had found not to be cognizable. And she found that Lopez Garcia did not qualify for relief under CAT because he had failed to present evidence that he would be tortured by Guatemalan officials or with their acquiescence.

### D.

Lopez Garcia appealed the IJ's decision to the BIA. The BIA did not address the IJ's findings about Lopez Garcia's credibility but affirmed because Lopez Garcia failed to identify a cognizable social group. It found that "[e]ven assuming the respondent's credibility," Lopez Garcia "did not establish that his proffered particular social group is cognizable under the [Immigration and Nationality Act]." (*Id.* at Page 000004). The BIA agreed with the IJ that the identified group was "impermissibly circular because it is defined by the alleged harm—extortion." (*Id.*). And it agreed that Lopez Garcia had not shown that his social group was "socially distinct or distinguishable from Guatemalan people in general who are also susceptible to extortion by gangs." (*Id.*). It also found that Lopez Garcia had failed "to show that the proposed social group is perceived or considered to be a discrete group by Guatemalan society." (*Id.*).

So the BIA found that Lopez Garcia was not eligible for asylum or withholding of removal. And it agreed that Lopez Garcia's failure to show that the Guatemalan government would acquiesce to his torture by the gangs defeated his CAT claim.

Lopez Garcia timely appealed.

### II.

### A.

When the BIA reviews an IJ's decision and issues its own opinion, "we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009).

But "[t]o the extent the BIA adopted the immigration judge's reasoning, . . . this Court also reviews the immigration judge's decision." *Id*. We review the agency's legal conclusions de novo. *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006). And we review the agency's factual findings for substantial evidence. *See Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020); *Zheng v. Lynch*, 819 F.3d 287, 293 (6th Cir. 2016). So factual findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Yousif v. Garland*, 53 F.4th 928, 934 (6th Cir. 2022) (cleaned up).

**B.**

Lopez Garcia argues that the BIA erred when it declined to rule on the IJ's adverse credibility findings. True enough, Lopez Garcia argued against this finding when he appealed to the BIA. But the BIA did not have to rule on every argument he made. It had only to "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Scorteanu v. I.N.S.*, 339 F.3d 407, 412 (6th Cir. 2003) (quoting *Osuchukwu v. I.N.S.*, 744 F.2d 1136, 1142–43 (5th Cir. 1984)). And "[a]s a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach." *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam). Here, the BIA acknowledged the IJ's adverse credibility finding, but only affirmed the IJ because Lopez Garcia's particular social group was non-cognizable. In doing so, it "assum[ed] [Lopez Garcia's] credibility." (A.R. 9-2, Page 000004). Its decision to reject Lopez Garcia's proposed social group as non-cognizable, "untainted by any error in assessing [Lopez Garcia's]

credibility, was an adequate and independent ground to deny [his] claim." *See Viuda De Mejia v. Sessions*, 691 F. App'x 245, 249 (6th Cir. 2017).[1]

Because the BIA assumed Lopez Garcia's credibility, we do likewise. *Gonzalez-De Leon v. Barr*, 932 F.3d 489, 492 (6th Cir. 2019); *see also Bonilla-Morales v. Holder*, 607 F.3d 1132, 1135–36 (6th Cir. 2010); *Ayyad v. Holder*, 391 F. App'x 485, 488 (6th Cir. 2010). And because, as explained below, Lopez Garcia has not brought viable challenges to the BIA's rejection of his proposed social group, we do not address his credibility arguments on the merits. *Viuda De Mejia*, 691 F. App'x at 249; *see also Haider v. Holder*, 595 F.3d 276, 282 (6th Cir. 2010); *Dealmonte-Castillo v. Sessions*, 737 F. App'x 282, 285 (6th Cir. 2018).

## C.

We turn to the merits of Lopez Garcia's asylum and withholding of removal claims. To receive asylum, an immigrant must show persecution or a well-founded fear of persecution based on "race, religion, nationality, membership in a particular social group, or political opinion."

---

[1] Lopez Garcia also argues that the IJ's adverse credibility determination will be held against him in future discretionary proceedings as law of the case. But he doesn't point us to any caselaw that suggests that an adverse credibility finding by an IJ that is not adopted by the BIA is binding in future proceedings. Instead, Lopez Garcia cites several cases in which the BIA and the courts of appeals found an adverse credibility determination relevant in either granting or denying relief. *See In re S-Y-G-*, 24 I. & N. Dec. 247, 252 (BIA 2007) (declining to exercise its discretion in a motion to reopen where the petitioner had been found incredible by the IJ); *Yang Lin v. Holder*, 364 F. App'x 236, 239 (6th Cir. 2010) (per curiam) (upholding the denial of a motion to reopen after an adverse credibility finding); *see also Mingkid v. U.S. Att'y Gen.*, 468 F.3d 763, 768–70 (11th Cir. 2006) (vacating a finding that petitioners filed a frivolous asylum petition where that finding was based on an adverse credibility determination). But in each of these cases, the IJ's adverse credibility finding was adopted by the BIA. So that finding was law of the case in later proceedings. *In re S-Y-G-*, 24 I. & N. Dec. at 250; *Yang Lin*, 364 F. App'x at 239; *Mingkid*, 468 F.3d at 768–69. If the BIA issues an opinion separate from the IJ's, we review the BIA's opinion as the final agency determination. *Khalili*, 557 F.3d at 435. Here the BIA did not adopt the IJ's credibility finding.

So we expect that if the adverse credibility finding is used against Lopez Garcia in a later proceeding, he will be able to raise the issue there.

8 U.S.C. §§ 1158(b)(1)(B)(i); 1101(a)(42)(A); *see also Selami v. Gonzales*, 423 F.3d 621, 625 (6th Cir. 2005). And an applicant seeking withholding of removal faces "a more stringent burden than what is required on a claim for asylum." *Umaña-Ramos v. Holder*, 724 F.3d 667, 674 (6th Cir. 2013). To qualify for withholding of removal, the applicant must show "a clear probability that he will be subject to persecution if forced to return to the country of removal." *Id*. And that persecution must be "on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id*. (cleaned up); (citing 8 U.S.C. § 1231(b)(3)(A)).

In his application for asylum, Lopez Garcia listed his membership in a particular social group as the basis for his claim. A particular social group requires "(1) a shared 'immutable' or 'fundamental' characteristic; (2) 'social visibility;' (3) 'particularity;' and (4) the group 'cannot be defined exclusively' by the fact that its members have been subject to harm." *Kante v. Holder*, 634 F.3d 321, 327 (6th Cir. 2011) (citations omitted). And "[a] group's shared characteristic 'must be one that members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.'" *Zometa-Orellana v. Garland*, 19 F.4th 970, 978 (6th Cir. 2021) (quoting *Bi Xia Qu v. Holder*, 618 F.3d 602, 606 (6th Cir. 2010)).

Lopez Garcia defined his particular social group as "young Guatemalan males who are perceived to be wealthy because they have family in the United States, and as a result, are extorted by gang members." (A.R. 9-2 at Page 000125, 175) As the IJ and BIA correctly noted, this social group is circular because it is defined by the alleged harm. And to prevail on a claim for asylum, an applicant's group "must share a narrowing characteristic other than their risk of being persecuted." *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005).

9

Lopez Garcia acknowledges that the formulation of his particular social group was "inartful." (Pet. Br. at 21). Still, he urges us to ignore the circular portion of the definition as "entirely superfluous." (*Id.*) So, he argues, we should treat his particular social group as "young male[s] marked as wealthy because [they have] family in the [United States]." (*Id.*)

This argument has two problems. First, "an applicant 'has the burden to clearly indicate the *exact delineation* of any particular social group(s) to which she claims to belong'" to the IJ. *Gonzalez-Valencia v. Barr*, 764 F. App'x 510, 512 (6th Cir. 2019) (quoting *Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. 189, 191 (BIA 2018) (emphasis added)). Lopez Garcia presented the same circular social group to the IJ and the BIA. So his argument that we should allow him to reformulate his definition at this stage is not well taken.

But even if we accept Lopez Garcia's reformulated particular social group to exclude the circular portion, his asylum claim fails. The second problem with this particular social group is that it lacks social visibility and particularity. The particularity requirement addresses whether "the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." *Al-Ghorbani v. Holder*, 585 F.3d 980, 994 (6th Cir. 2009) (quoting *In re S-E-G-*, 24 I. & N. Dec. 579, 584 (BIA 2008)). And social visibility "requires 'that the shared characteristic of the group should generally be recognizable by others in the community.'" *Id.* (quoting *In re S-E-G-*, 24 I. & N. Dec. at 586). "The shared characteristic 'must be considered in the context of the country of concern and the persecution feared.'" *Id.* (quoting *In re S-E-G-*, 24 I. & N. Dec. at 586–87). And "the persecutors' perception is not itself enough to make a group socially distinct." *Zaldana Menijar v. Lynch*, 812 F.3d 491, 499 (6th Cir. 2015) (citation omitted).

We have repeatedly found that those who are perceived as wealthy because of their ties to the United States do not constitute a particular social group. *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692 (6th Cir. 2015) (collecting cases); *see also Esteban v. Holder*, 478 F. App'x 301, 302–03 (6th Cir. 2012) (finding that the group "Guatemalans who are perceived to possess a significant amount of wealth because they have lived in the United States" was non-cognizable).

Lopez Garcia argues that the BIA failed to adequately evaluate his particular social group because it relied too heavily on the role of wealth and did not recognize his age and gender as immutable characteristics that give him "heightened social visibility as a target for the [local gangs]." (Pet. Br. at 21–22). And he claims that the gangs imputed American nationality to him as a result of his father's residence in the United States. While Lopez Garcia did present evidence that Americans are targeted for gang victimization in Guatemala, this does not help him. "[T]he persecutors' perception is not itself enough to make a group socially distinct." *Zaldana Menijar*, 812 F.3d at 499 (citations omitted). Even if the gangs would impute American identity to him, this is not enough. Lopez Garcia must show that the broader Guatemalan society would recognize his group as distinct. And he has not done so. Lopez Garcia's proposed group would essentially permit all young Guatemalan men with family in the United States to claim asylum. Such a group is far too broad to make it sufficiently particular. *See Umaña-Ramos*, 724 F.3d at 674 (collecting cases when proposed social groups were found to be non-cognizable because they were too generalized or sweeping).

Lopez Garcia also argues that the BIA erred in disregarding the impact his family membership had on his particular social group. Family membership can sometimes count as membership in a particular social group. *See Al-Ghorbani*, 585 F.3d at 995. But that's only "when that family is 'recognizable as a distinctive subgroup of society.'" *Navas-Medina v. Barr*, 833 F.

11

App'x 631, 633 (6th Cir. 2020) (citing *Al-Ghorbani*, 585 F.3d at 995). This means that the family must have a "greater meaning in society," not merely be "set apart in the eye of the persecutor." *Id.* (citation omitted). Lopez Garcia has made no showing that his family has a greater meaning or that Guatemalan society would perceive his family membership as socially distinct. The only people who he has suggested would recognize his family membership are his persecutors. Lopez Garcia does cite evidence that Guatemalan gangs often victimize the family members of those who come into conflict with the gang. But the evidence does not match his situation. He does not claim that his family will be targeted in reprisal for his actions. Instead, he claims that he will be targeted based on his family's presence in the United States. So this fails too.

Lopez Garcia next argues that the BIA erred in ignoring key changes of law. He argues that the BIA did not consider the effect of *Matter of A-B-*, 28 I. & N. Dec. 307 (A.G. 2021) (*A-B-III*) on the scrutiny given to gang-related claims, or the effect of *Matter of L-E-A-*, 28 I. & N. Dec. 304 (A.G. 2021) (*L-E-A-III*) on family-related claims. In *A-B-III*, the Attorney General vacated previous guidance that "'victims of private criminal activity' will not qualify for asylum except perhaps in 'exceptional circumstances.'" 28 I. & N. Dec. at 308 (citation omitted). But Lopez Garcia doesn't explain how this decision impacts his case. And on our read of the record, there is no evidence that either the IJ or the BIA applied this "exceptional circumstances" presumption. They simply found that Lopez Garcia had not alleged membership in a group that was "socially distinct or distinguishable from Guatemalan people in general who are also susceptible to extortion by gangs." (A.R. 9-2, 000004).

In *L-E-A-III*, the Attorney General vacated previous guidance that "in the ordinary case, a nuclear family will not, without more, qualify" as a particular social group. 28 I. & N. Dec. at 304 (citation omitted). But again, there is no evidence that either the IJ or the BIA rejected his proposed

social group because it included a family component. Nor do we. Although some nuclear families constitute a particular social group, *see Al-Ghorbani*, 585 F.3d at 995, Lopez Garcia did not show that *his* family was sufficiently socially distinct to qualify. So the BIA did not err on this ground.

Lopez Garcia also faults the BIA for ignoring two unpublished BIA decisions. *L-M-R-*, AXXX XXX 221 (BIA April 26, 2016) (unpublished); *V-H-C-C-*, AXX XXX 507 (BIA Nov. 12, 2019). He claims that L-M-R supports the age component of his particular social group and V-H-C-C- supports his argument that the government is unwilling and unable to protect him from gangs. We have warned that "reliance on unpublished BIA decisions is misplaced as the BIA accords no precedential value to its unreported decisions." *Jomaa v. United States*, 940 F.3d 291, 298 (6th Cir. 2019) (citation omitted). And the opinions do not help Lopez Garcia anyway because they involve social groups that Lopez Garcia has not claimed membership in.[2] So the BIA's decision is not contrary to these unpublished opinions, and the BIA did not err in failing to discuss them.

## D.

Lopez Garcia argues that his "decision to flee in refusal of the [gangs'] orders constitutes an imputed political opinion." (Pet. Br. at 26). Lopez Garcia did not raise this claim before the IJ or the BIA. And on his application, he specifically declined to claim asylum or withholding based on political opinion. Because this argument was not exhausted through presentation to the BIA, we decline to consider it. *See Santos-Zacaria v. Garland*, 143 S. Ct. 1103, 1111 (2023).

---

[2] In *L-M-R-*, the BIA found "children unable to leave their domestic relationships" to be a cognizable particular social group. (A.R. 9-2 at Page 000050). And in *V-H-C-C-*, DHS did not meaningfully contest that the petitioner's particular social group of "former military members of the Kaibil" was cognizable. (*Id.* at Page 000054).

**E.**

Finally we turn to Lopez Garcia's CAT claim. The Government argues that Lopez Garcia forfeited his challenge to the BIA's denial of his CAT claim because he failed to meaningfully raise it in his opening brief.[3] Lopez Garcia counters that he preserved this claim by stating that "the anti-Mara stance he has demonstrated through his actions as recognized by the above-cited cases and buttressed by the extensive documentation he has submitted render it likely that he will be tortured and likely killed upon return to Guatemala, thus entitling him to relief under CAT." (Rep. Br. at 8; Pet. Br. at 28–29).

"Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited." *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013) (citing *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)). Lopez Garcia has provided no caselaw to support his contention that he is entitled to relief under CAT. And even if we were to consider his CAT claim, he hasn't demonstrated that he is in danger of being tortured upon his return to Guatemala. *Garcia v. Barr*, 960 F.3d 893, 896 (6th Cir. 2020). Nor has he demonstrated that any torture would be carried out "with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1); *Garcia*, 960 F.3d at 896. Lopez Garcia has alleged that the Guatemalan government is not in control of the gangs. But "[inability] to control the gangs does not constitute acquiescence."

---

[3] The government states that Lopez Garcia waived the claim. However, "[w]hen a party fails to preserve a defense by neglecting to raise it in the district court, that defense is usually deemed to have been forfeited." *Cradler v. United States*, 891 F.3d 659, 665 (6th Cir. 2018) (citation omitted).

*Zaldana Menijar*, 812 F.3d at 502; *Garcia*, 960 F.3d at 896.[4] So we cannot say that the BIA erred in finding he did not qualify for CAT protection.

### III.

The BIA did not err in denying Lopez Garcia's application for asylum, withholding of removal, or CAT protection. So we **AFFIRM**.

---

[4] In his argument before the BIA, Lopez Garcia also cited evidence that the National Civil Police of Guatemala are responsible for "arbitrary or unlawful killings," "harsh and sometimes life threatening prison conditions," and "arbitrary arrest and detention," among other forms of abuse. (A.R. 9-2 at Page 000027). But even assuming this is true, he has made no showing that the police would likely target him for torture. So there is no evidence "that it is more likely than not that he . . . would be tortured if removed to [Guatemala]." *Zaldana Menijar*, 812 F.3d at 501 (citing 8 C.F.R. § 1208.16(c)(2)).